# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| A.S. and W.S. individually and through their parents and next friends, Mr. and Mrs. W.S., | : : : | |
| | : | Case No. 3:04CV847 (MRK) |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| TRUMBULL BOARD OF EDUCATION, | : | |
| | : | |
| Defendant. | : | |

## <u>MEMORANDUM OF DECISION</u>

Plaintiffs A.S. and W.S. are minor children living in Trumbull, Connecticut. They bring this lawsuit individually and through their parents and next friends, Mr. and Mrs. W.S., who are referred to collectively as the "Parents." A.S. and W.S. allege that Defendant Trumbull Board of Education ("the Board") denied each of them a free and appropriate public education by refusing to fund the cost of placing the children in a private school for the 2003-2004 school year. Plaintiffs also claim that the Board has breached the terms of a 2002 settlement agreement. Plaintiffs have sought to supplement the record with the children's educational and medical records for the 2004-2005 school year [doc. #45], and also have moved for judgment on three counts of their complaint [doc. #49] and for summary judgment on the other two counts [doc. #52]. The Board has moved for judgment on the administrative record on the first four counts and for summary judgment with respect to the breach-of-contract claim [doc. #65]. For the reasons that follow, Plaintiffs' motions [docs. ## 45, 49, & 52] are DENIED, and the Board's motion [doc. #65] is GRANTED.

**I**.

The Court will address the facts relating to A.S. and W.S. separately.  For clarity's sake, the following factual summary cites primarily to the administrative Hearing Officer's decisions, which in turn cite to documents from the administrative record.  The Court's citation convention should not be taken as an indication that the Court has ignored the exhibits Plaintiffs have filed in support of their summary judgment motion or the underlying administrative record.  *See* Index to Exhibits in Support of Plaintiffs' Motion for Summary Judgment [doc. #55] (attached exhibits); Plaintiff's [sic] Notice of Filing Administrative Record of Due Process Hearing [doc. #57] (attached documents).  To the contrary, the Court has thoroughly reviewed and considered the administrative record and the parties' exhibits.

**A.     A.S.**

A.S. was born in April 1992.  Complaint [doc. #1] App. A at 4 [hereinafter "A.S. Decision"].  Educational evaluations performed on A.S. in September and October 1999 showed average or slightly below-average performance.  *Id.* at 4-5.  At a Planning and Placement Team ("PPT") meeting in November 1999, A.S. was deemed ineligible for special education, but the PPT decided to continue to monitor her progress.  *Id.* at 5.  Testing performed in October 2000 indicated below-average performance, and in a PPT meeting held in November 2000, A.S. was identified as having a learning disability.  *Id.*  The PPT also noted that A.S. suffered from seasonal allergies and periodic asthma.  *Id.* at 6.  The Individualized Education Program ("IEP") adopted for A.S. at the PPT meeting detailed A.S.'s strengths and weaknesses, outlined educational goals, and prescribed steps to further her progress.  In January and June 2001, additional PPT meetings occurred during which A.S.'s IEP was further reviewed and modified.  *Id.* at 7.

A.S. has a history of allergies and asthma.  Tashua Elementary School, which A.S. was then attending, first received notice of her allergies in March 1998.  A.S.'s Individualized Health Care Plan noted her medical history and provided for the administration of emergency medication when necessary.  However, health assessment forms provided by the Parents to Tashua Elementary School in March 1997 and April 2000 indicated no concerns about allergies, and neither allergies nor asthma was mentioned in physician medical evaluations given to the school in April 1997 and April 2000.  A.S.'s parents provided medications to the school for use in emergency situations, but those medications remained unused through the end of the 1999-2000 school year.  *Id.*  In consultation with her Pediatric Allergist, Dr. John Santilli, A.S. began receiving allergy injections and other medications beginning in the spring of 2001 to control her allergic symptoms.  These medications may have affected her academic performance.  *Id.* at 8.

A.S.'s Parents raised with school administrators concerns about the indoor air quality of Tashua Elementary School, and in March 2001 the Board hired AMC Technologies ("AMC") to test the school for allergens.  AMC inspected several areas of the school building, conducting air and carpet dust sampling.  In April, AMC submitted a written report to the Board recommending that the Board repair any roof leaks, clean or remove the carpet, clean or replace all air filters, improve air circulation, and further investigate the gym area.  The report also identified several types of fungal spores that AMC had found.  AMC conducted follow-up sampling in May 2001, focusing on certain mold species, and submitted a written report in June that recommended remediation measures for the school, such as replacing air handling unit filters, keeping the area around the units clean, and regularly cleaning air ducts.  *Id.*

Dr. Santilli, A.S.'s allergist, sent Tashua Elementary School seven letters during the 2001-

2002 school year maintaining that the school's facilities were causing A.S. to suffer from allergic reactions.  The letters recommended that A.S. be given homebound instruction.  Based upon Dr. Santilli's advice, the Parents removed A.S. from school in September 2001 and home schooled her for most of the 2001-2002 school year.  *Id.*

On September 19, 2001, A.S.'s father filed a complaint with the United States Department of Education's Office of Civil Rights, alleging that A.S. had been discriminated against because of her allergic sensitivities.  A.S. Ex. B-38.  The complaint asserted that Tashua Elementary School had refused to test environmental air quality or to follow through on necessary remediation measures.  The complaint also alleged that A.S. was denied access to a suitable physical education program, and to a computer lab and library that were safe for her to use.  *Id.*

At a meeting held in October, 2001, the PPT developed a program for A.S.'s home study according to which A.S.'s special education and classroom teachers were to consult with A.S.'s tutor and to monitor her progress.  A.S. Decision at 9.  Another PPT meeting was held in November to discuss A.S.'s mother's belief that A.S. needed more tutoring time.  However, a resource teacher who had been involved in A.S.'s educational evaluations and curriculum development conducted a curriculum-based assessment and concluded that A.S. did not need additional tutoring time.  *Id.* While the Parents expressed a preference for use of the Lindamood-Bell reading program in A.S.'s education, "the Resource Teacher stated that she wouldn't want to be tied into one program and prevented from using other strategies."  *Id.*  At the PPT meeting in October, A.S.'s progress was deemed satisfactory, and the PPT made some further modifications to her educational program and educational goals.  *Id.* at 10.

In consultation with the Office of Civil Rights, the Board hired an Industrial Hygienist,

Gilbert Cormier, to inspect and make recommendations regarding the Tashua Elementary School. After inspecting the school building and testing indoor air quality, Mr. Cormier recommended several measures to reduce the levels of allergens at the school. Mr. Cormier stressed that no federal or state standards for allergens in schools existed and that allergen exposure could be minimized but not totally eliminated. *Id.* The Board sent a copy of Mr. Cormier's extensive report to the Parents and held a public meeting for parents of all students enrolled in the school (which the Parents attended) to discuss Mr. Cormier's findings and the school's remediation efforts. *Id.* at 11-12.

In November and December, 2001, the Board began to implement the remediation steps suggested by Mr. Cormier. Among other measures, the Board destroyed old gym mats, removed dirty insulation, ripped up carpets, and removed a portion of a wall identified as problematic by Mr. Cormier. A.S. Ex. B-58 at 4-7. The Board also agreed to allow Dr. Santilli to conduct on-site testing at Tashua Elementary School. *Id.* at 5. Based on the Board's willingness to permit this testing, as well as the Board's remediation efforts and promise to implement all of Mr. Cormier's recommendations, the Office of Civil Rights deemed the Parents' complaint to be concluded, though the Office promised to "monitor implementation of the [School] District's commitments." *Id.* at 7.

In January 2002, another PPT meeting was held to discuss A.S.'s return to Tashua Elementary School. As a result, the PPT proposed that A.S. return to school for partial days, to which the Parents agreed. Dr. Santilli recommended that A.S. limit herself to areas of the school that had been found to have acceptably low mold-spore levels. A.S. Decision at 10. Test results reported by Dr. Santilli described A.S. as showing moderate allergic reactions to molds. The Parents tested air samples at Tashua Elementary School with equipment provided by their children's allergist and found that two special education rooms, which had air purifiers, showed fewer than 1,000 spores per

cubic meter.  However, several other areas of the school had significantly higher mold counts according to the Parents' testing.  *Id.* at 11.

In early February, the Parents arranged for A.S. to be evaluated by an educational consultant, Shelley Lacey-Castelot.  Ms. Lacey-Castelot diagnosed A.S.'s educational needs and provided goals and recommendations.  Several of Ms. Lacey-Castelot's recommendations matched those in A.S.'s IEP; several additional recommendations related to A.S.'s language skills, including a need for assistive technology to help with reading and writing, as well as software recommendations.  *Id.* at 12.

A.S. returned to Tashua Elementary School for partial days in February and March 2002, confining herself to limited areas in the school building that had been remediated.  *Id.* at 8.  Dr. Santilli wrote on February 19 that A.S. was doing well and could remain at school for thirty days, provided she stayed in the areas that had been shown to have low mold-spore counts.  At a PPT meeting on February 25, the Parents and teachers agreed that A.S. was doing well.  *Id.* at 12.

Nevertheless, A.S.'s allergic symptoms resumed less than two weeks after she was back at Tashua Elementary School.  *Id.* at 8.  On March 4, Dr. Santilli examined A.S. and discovered that her symptoms had returned.  Dr. Santilli's test results, along with A.S.'s allergic history, caused him to recommend that A.S. again be removed from school.  *Id.* at 13.  As a consequence, A.S. resumed homebound instruction.  The Parents reported that while receiving homebound instruction, A.S. needed less medication and generally "felt better."  *Id.* at 10.

At a March 13 2002, PPT meeting, the PPT asked for a psychiatric evaluation of A.S. and for a second medical opinion about her allergies.  PPT members also questioned the content and conclusions of Ms. Lacey-Castelot's evaluation and raised concerns about the fact that Ms. Lacey-

Castelot sells the software she recommends.  The PPT recommended further educational testing for A.S.  It also suggested that placing A.S. in another school within her school district would accommodate A.S.'s allergy issues.   However, the  Parents requested homebound instruction for A.S., and also asked that any placement of A.S. in another school not take place until the school had been tested for allergens.  *Id.* at 13.

The PPT reconvened on March 15, during which it reviewed A.S.'s educational goals.  A.S. was reported to be making progress on all her objectives, though completing assignments within allotted times had proven to be a recurring issue.  The PPT refused to accept  the Parent's request for homebound instruction or to conduct allergen testing before A.S. enrolled in a different school.  However, the PPT did propose that A.S. receive the following options: (1) partial-day instruction in those rooms shown to have relatively few allergens; (2) full-day instruction in those rooms, or (3) full-day instruction with access to the whole building.  The PPT again requested a second medical opinion about A.S.'s allergies.  A.S. did not receive educational services for several weeks.  *Id.*

The Board's Reading Consultant, who had participated in several of A.S.'s PPT meetings, provided reading services to A.S. and consulted with other staff members about her reading needs.  Following periodic evaluations, the Reading Consultant reported that while A.S. struggled with reading, she generally tested within the average range.  *Id.* at 14.  The Board also had an Occupational Therapist evaluate A.S.  The Occupational Therapist reported that A.S. scored within the average range on a variety of fine motor tests, but below average on a timed test of upper limb speed and dexterity.  A.S. Ex. B-71.  The Occupational Therapist recommended steps to improve her fine motor, visual motor, and sensory processing skills.  *Id.* at 5.  On six occasions during the fall of 2002, the Occupational Therapist provided additional occupational therapy services to A.S.

A.S. Decision at 14.

The Parents arranged for another pediatric allergist to evaluate A.S. in March 2002. The allergist did not conduct skin testing, and his conclusions were based on a medical history and on records provided by the Parents. On March 26, the allergist recommended that A.S. not return to Tashua Elementary School until a full mold remediation had been completed. *Id.* The Board then requested an independent medical evaluation, to which A.S.'s Parents agreed. The evaluator, Dr. Thomas Danyliw, was Medical Director of Occupational Medicine at Middlesex Hospital. Dr. Danyliw is board certified in occupational and environmental medicine, a specialty that concerns itself with the work environment and with medical issues as they relate to the environment of workers and others. *Id.* at 15. Dr. Danyliw has experience with the health issues that arise from exposure to mold and bacteria in buildings. 12/16/03 Hearing Tr. at 8-10 (testimony of Dr. Danyliw). Dr. Danyliw based his report on a history taken from A.S.'s Parents and on the records provided by Dr. Santilli. Dated May 18, Dr. Danyliw's report states that he had insufficient data to conclude that A.S. suffered from mold allergies. He did note that A.S.'s physical appearance and the history the Parents had provided were consistent with their belief that A.S.'s presence in Tashua Elementary School contributed to her allergy symptoms. A.S. Decision at 15.

Dr. Danyliw's report noted that "[n]o one can accurately answer the question as to what quantity of a substance will trigger an allergic or irritant reaction in any given subject. . . . Based on the testing that has been done at [Tashua Elementary School], it is my opinion that molds exist in a sufficient quantity to produce mycotoxins that in a sensitive individual could result in a reaction that appears to be allergic or irritant." *Id.* However, he also added, that he was "unaware of any credible evidence or opinion that would indicate exposures to molds that are in Tashua Elementary

would result in learning difficulties or concentration problems." A.S. Ex. B-77 at 4. Dr. Danyliw observed that he had no recommendations for remediation beyond those suggested by AMC and Mr. Cormier. Dr. Danyliw concluded his report by noting that "it would be ill advised to allow [A.S.] back into [Tashua Elementary] until remediation is complete and spore counts have dropped on average below 1,000 spores per cubic meter," A.S. Decision at 16, though he emphasized that he was unaware that any "agreement on an objective measure of 'safe' levels of mold" existed, *id.* at 17. Dr. Danyliw also noted that there was "no legitimate reason" that A.S. could not attend a different public elementary school "as long as the mold counts are within acceptable levels." *Id.* at 16. Finally, Dr. Danyliw questioned whether it was appropriate for a physician without formal training to conduct indoor air quality testing, and he recommended that air testing be performed by a certified industrial hygienist. *Id.* at 17.

The PPT again convened on June 7 to review A.S.'s test results and to revise her IEP. *Id.* A.S.'s overall results were found to be within an average range, but she displayed weakness in certain language skills. *Id.* at 18. A.S.'s report card for the 2001-2002 school year showed grades almost exclusively in the A/B range. *Id.* at 13-14. The PPT revised A.S.'s IEP to provide for additional language training and offered an extended-year home-schooling program. The Parents again requested that Tashua Elementary School be re-tested before A.S. would enroll in it, but the PPT again refused. *Id.* at 18.

The Board also hired a technology consultant who evaluated A.S. on June 12. The consultant recommended that A.S. be given access to a computer at school and at home, as well as three specific software programs – CoWriter 4000, IntelliTalk Two, and Inspiration. The consultant made an optional recommendation for a fourth program, Kurzweil 3000. The consultant noted that her

philosophy was to provide technological support to students in a manner that would interfere as little as possible with the students' ability to participate in regular classes. She recommended against voice-recognition software, which she believes isolates students. *Id.* at 18.

In August, the PPT convened to review test results and air quality at Tashua Elementary School and to plan for A.S.'s 2002-2003 school year. *Id.* Tashua Elementary had undergone what the Board believed was substantial remediation, including the installation of air conditioners in many rooms and the removal of carpets. As a result, the Board believed that mold problems had been eliminated, and the PPT recommended that A.S. return to Tashua Elementary School. *Id.* at 18-19. The Parents noted concern about the air quality in the art room, and the PPT assured them that the art room would be tested and, if necessary, that air conditioning would also be installed in the art room. The PPT also agreed to provide A.S. with the three software programs recommended by the Board's technology consultant, as well as books on tape, but refused to provide Kurzweil 3000 pending a discussion with the consultant about its "optional" nature. The PPT also rejected additional items that Ms. Lacey-Castelot had requested. *Id.* at 19.

The IEP presented at the meeting by the PPT also included several hours per week of tutoring and speech and language therapy for A.S.. The use of educational software would be worked into regular education classes, and accommodations would be made for A.S.'s test-preparation and test-taking needs. A.S. was also to be given preferential seating and modified grades. In addition to the remediation measures already conducted, the Board also agreed to perform air-quality testing at Tashua Elementary School when necessary. *Id.*

Nevertheless, due to their continued concerns about the air quality at Tashua Elementary School, the Parents withdrew A.S. from the school and enrolled her for the 2002-2003 school year

at Villa Maria, a private school approved for special education by the Connecticut State Department of Education.  *Id.* at 18.  The Parents said that they tested the indoor air quality at Villa Maria using equipment provided by Dr. Santilli but, despite requests from the Board, the Parents never provided the Board with any results from their testing at Villa Maria.  *Id.* at 19.  The Parents requested a due process hearing to discuss A.S.'s placement, and ultimately they reached an agreement with the Board on October 17 (the "settlement agreement").

The settlement agreement provided, among other things, that the Board would contribute $50,000 toward the tuition of both A.S. and W.S. (who had also been enrolled at Villa Maria); that the Board would pay $5,000 to the Parents for "miscellaneous educational expenses"; and that the Board would provide transportation to and from Villa Maria for both A.S. and W.S.  Affidavit of Brenda McNeal [doc. #69] Ex. 1 at 1-2.  As is relevant to the present dispute, the settlement agreement also provided as follows:

> The BOARD shall be responsible for the cost, up to the aggregate amount of Five Thousand Dollars ($5,000.00) of any assistive technology required for the exclusive use of the STUDENTS while at the Private School ("the Assistive Technology Payment"), so long as the Private School renders an opinion in writing that such assistive technology is required in order to provide the STUDENTS with an appropriate education and the Private School does not have available such assistive technology or its functional equivalent.  The Assistive Technology Payment shall be made directly to the Private School upon receipt of documentation in form and substance acceptable to the BOARD of both the need for and cost of such equipment and/or materials.  Upon the earlier of the conclusion of the 2002-2003 school year or such time as either of the STUDENTS is no longer attending the Private School, the Private School shall return any and all assistive technology and materials purchased pursuant to this provision to the BOARD.

*Id.* Ex. 1, at 2.  In the settlement agreement, the Board denied that A.S.'s educational needs necessitated out-of-district placement.  *Id.* Ex. 1 at 1.

A.S. attended Villa Maria for the 2002-2003 school year.  Her attendance during the year was

good, and her parents reported that she was "off all medications." A.S. Decision at 18. A.S.'s doctor reported that during the year her health had improved. Plaintiff's [sic] Amended Statement of Material Facts Not in Dispute in Support of Plaintiffs' Motion for Summary Judgment [doc. #63] ¶ 45 [hereinafter "Pls.' 56(a) Statement"].

On June 20, 2003, after the close of the school year, Villa Maria sent a letter to the Board stating that "[s]hortly after [A.S.'s and W.S.'s] admission it became apparent that, in order to provide them with an appropriate education, we would need to provide supportive assistive technology." Affidavit of Brenda McNeal [doc. #69] Ex. 3. The letter listed the software and hardware that had been purchased by Villa Maria, as well as the hours of training required, and explained that A.S. and W.S. had used the assistive technology "primarily at home." *Id.* Villa Maria's letter explained in general terms the need for the software programs the children had used and maintained that the programs were necessary to assure the achievement of their educational goals. The letter also stated that of the software programs used by the children, Villa Maria was then in possession of only one program. The letter requested reimbursement of $5,000 and included a copy of the invoices from a company named Innovative Solutions Group, LLC. The invoices listed a bill for $5,001.95 for the programs purchased and a bill for $6,750.00 in training costs. *Id.*

On July 9, the Board wrote to Villa Maria denying its request for reimbursement. The Board's letter expressed disappointment that Villa Maria had contacted the Board *after* the close of the 2002-2003 school year, rather than before the computer programs had been purchased. The letter also stressed that the assistive technology was intended to be used to provide an appropriate education *at Villa Maria*, whereas Villa Maria's June 20 letter made clear that the technology was being used exclusively at the children's home, demonstrating "that these computer programs were

not necessary to enable the children to receive an appropriate education in the school setting." Affidavit of Brenda McNeal [doc. #69] Ex. 4.  The Board's letter also noted that the invoices submitted in the June 20 letter included substantial costs related to software and hardware training, whereas "[i]t was never part of any agreement that the Trumbull Board of Education be responsible for paying the cost of any 'training,' regardless of the location."  *Id.*  Despite these observations, the Board expressed its willingness to consider reimbursing Villa Maria for the costs of the assistive technology purchases, provided that Villa Maria return the software and hardware, their licenses, and all accompanying materials to the Board, so they could be used by the Board for its educational programs.  *Id.*

On March 18, 2005, the Board wrote to Plaintiffs' attorney indicating its willingness to pay the $5,000 contemplated in the settlement agreement if the assistive technology – which was in the Parents' possession – would be turned over to the Board.  Affidavit of Brenda McNeal [doc. #69] Ex. 5.  The Board sent the attorney a $5,000 check payable to Villa Maria and directed him to hold the check in escrow until the Parents delivered the assistive technology to the Board.  However, Plaintiffs' attorney returned the check to the Board.  Affidavit of Brenda McNeal [doc. #69] ¶¶ 12-13 & Ex. 6.  As of the date of the oral argument before this Court on September 8, 2005, the Parents still had not delivered to the Board any software or hardware.  At the argument, the Board's attorney expressed her client's continued willingness to pay $5,000 toward the software and hardware, but only so long as they were turned over to the Board.  Minute Entry for Proceedings Held Before Judge Mark R. Kravitz on September 8, 2005 [doc. #71].  However, Plaintiffs' attorney informed the Court that the Parents refused to turn over the software and hardware to the Board.

On May 29, 2003, the PPT met to discuss A.S.'s placement for the 2003-2004 school year

and recommended that A.S. attend Madison Middle School.  A.S. Decision at 19.  The parties

dispute exactly what occurred at this meeting.  The PPT's meeting notes indicate that after

considering A.S.'s grades and test results from Villa Maria, an IEP was presented that the PPT

believed accommodated A.S.'s educational needs.  The Parents asked that any educational program

for A.S. include small class sizes, utilization of assistive technology, and continued use of the

Lindamood-Bell reading program.  A.S.'s father requested information about the environmental air

quality of Madison Middle School, which the Board agreed to forward to him.  The PPT also offered

a summer program at Villa Maria or summer tutorial at either a Trumbull Board of Education high

school or the library.  A.S. Ex. B-92 at 2; *see also* A.S. Decision at 19-21.

   According to a letter dated May 29, 2003, from Plaintiffs' attorney to the Board's Director

of Special Education, who had attended the PPT meeting, the meeting notes did not reflect A.S.'s

father's ultimate response to the proposed IEP for his daughter.  According to the lawyer, about two

hours after the meeting had begun, the Director of Special Education had excused the meeting

reporter "based upon a belief that the PPT had been adjourned."  A.S. Ex. P-12.  As a result, the

minutes did not reflect the fact that A.S's father had advised the PPT that he rejected the proposed

IEP for A.S., believing it inappropriate for his daughter.  According to the attorney's letter, A.S.'s

father's belief was based on the Board's refusal of his request for:

> A small class size with a student teacher ratio of approximately 1:3;.
> At least two hours of instruction per day with the Lindamood-Bell programs.
> Continuation of the assistive technology, including software, utilized by April at
> home and/or at school, that would assist her in meeting her IEP goals and objectives.
> Continuation of the current placement at Villa Marie [sic] for 2003-04 if these
> requests could not be met.

*Id.*  The father  had also expressed concerns about the environmental condition of Madison Middle

School and had requested a copy of environmental testing reports on the school.

-14-

In a letter dated June 2, the Board denied that the meeting had adjourned before A.S.'s father had been given a chance to voice his concerns on the record, but the Board agreed that the position stated in the attorney's letter represented A.S.'s father's position.  A.S. Ex. P-13.  The PPT rejected the request for continued support for A.S. to remain at Villa Maria.  Nevertheless, the Parents decided to enroll A.S. in Villa Maria for the 2003-2004 school year.  A.S. Decision at 19-21.

By letter on August 7, 2003, the Parents requested a hearing regarding the appropriateness of the PPT's IEP for A.S.  *Id.* at 2.  Mary H.B. Gelfman was appointed as Hearing Officer.  At the request of the Parents, the Hearing Officer agreed to hear both A.S.'s case and W.S.'s case at the same time.  Hearing sessions took place on sixteen different days between September 2003 and February 2004, during which Plaintiffs' attorney presented and cross-examined numerous witnesses. *Id.*   The hearings produced over 3200 pages of written transcript.  In addition, the administrative record before the Hearing Officer includes over 200 exhibits.  During the course of the hearings, the Hearing Officer considered the following issues:

> 1. Were the Individualized Education Program (IEP) and the placement offered by the Board at the May 29, 2003, Planning and Placement Team (PPT) meeting appropriate to Student's special education needs in the least restrictive environment?
>
> 2. Is the placement offered Student by the Board reasonably safe, in terms of indoor air quality, for Student?
>
> 3. If not, is placement at Villa Maria for the school year 2003-2004 appropriate?
>
> 4. Is the Board responsible for funding Student's placement at Villa Maria?
>
> 5. Is the Board responsible for reimbursement of assistive technology costs to the Parents during the 2002-2003 school year, per a prior settlement agreement, and for continuation of assistive technology services in 2003-2004?[1]

---

[1] At the September 22, 2003, hearing session, the Board argued that the Hearing Officer lacked authority to enforce the settlement agreement, and that issues regarding services under that

6. Did Student require assistive technology in 2002-2003 and/or 2003-2004, in order to benefit from special education?

7. Must the Board produce additional information/documentation concerning Environmental Air Quality inspections?

8. Is Lindamood-Bell instruction, an educational methodology, necessary for Student?

9. Does a special education hearing officer have the authority to enforce a prior settlement agreement between the parties?

10. Has the Board offered Student a safe school environment, pursuant to Section 504 of the 1973 Rehabilitation Act?

*Id.* at 1-2.

After receiving evidence, testimony, and briefing from the parties, the Hearing Officer issued a 28-page (single-spaced) Decision on April 8, 2004. In her Decision, the Hearing Officer concluded that the PPT's proposed IEP for A.S., which provided for her to attend Madison Middle School for the 2003-2004 school year, was appropriate. According to the Hearing Officer, A.S. had made progress both in public school and at Villa Maria, and the proposed IEP incorporated information gathered from A.S.'s teachers at Villa Maria, as well as from Ms. Lacey-Castelot. The Board's speech and language pathologist, who participated in the May 29, 2003, PPT meeting, testified that she intended to incorporate into A.S.'s reading curriculum the Lindamood-Bell reading program preferred by the Parents, as well as other techniques. "The PPT also demonstrated willingness to further accommodate [A.S.], if necessary, after her enrollment." *Id.* at 23. The Hearing Officer noted that the Parents had asked for funding for the purchase of computer programs recommended by Mrs. Lacey-Castelot, and that the PPT had offered some, though not all, of these

---

agreement could not be considered by the Hearing Officer. *Id.* After receiving briefing from both sides, the Hearing Officer agreed that she lacked authority to enforce the settlement agreement. *Id.* Therefore, her Decision did not address the parties' arguments regarding the settlement agreement.

programs in its proposed IEP.  According to the Hearing Officer, the Board's technology consultant had advised that technology support "should be minimal unless a child requires more intrusive devices," a philosophy the Hearing Officer found was confirmed by the Connecticut State Department of Education 1999 Guidelines for Assistive Technology.[2]  *Id.* at 26.  Finding the proposed IEP appropriate, the Hearing Officer declined to prescribe any specific educational regimen, such as the Lindamood-Bell program.  While "[p]arents may make suggestions at a PPT meeting, . . . a hearing officer has no authority to override the professional judgment of appropriately trained and certified school staff members."  *Id.* at 25.

The Hearing Officer also discussed the Parents' concerns for A.S.'s health.  The Executive Director of Villa Maria had testified that an aggressive cleaning regimen was employed at Villa Maria to provide students with an "aseptic environment."  Dr. Santilli, who also testified, had praised Madison Middle School, but questioned whether "water intrusion" during the summer of 2003 had possibly contaminated the building.  Mr. Cormier testified that he had done a "walkthrough" inspection of one of Madison Middle School's buildings, but that he did not conduct air sampling testing or generate any formal report.  Pls.' 56(a) Statement ¶ 49.  However, neither party submitted any evidence of complaints about indoor air quality at Madison Middle School.

The Hearing Officer examined an indoor air quality status report, dated September 10, 2003, for Madison Middle School that had been prepared by the Board's Plant Administrator and an Indoor Air Quality Specialist.  That report identified possible areas of concern and described the Board's ongoing remediation efforts at Madison Middle School.  These efforts included installation of roof

---

[2] The Hearing Officer quoted the Guidelines for Assistive Technology for the proposition that "If a low-tech device meets the child's particular needs, then the school is not obligated to purchase the high-tech device which may also solve the same problem."  *Id.* at 26.

air conditioning units, regular changing of air filters, replacement of stained ceiling tiles and contaminated carpets, cleaning of unit ventilators, and investigation and remediation of staff complaints. *Id.* at 22.

While Dr. Santilli urged the adoption of a specific safety standard – 1,000 mold spores per cubic meter of air – the Hearing Officer observed that Dr. Danyliw and Mr. Cormier, "with both professional training in this area and significant experience," noted that there was no consensus among regulators or professional organizations as to appropriate air-quality safety standards. *Id.* at 23-24. Instead of a spore-counting method, Dr. Danyliw and Mr. Cormier had recommended a more pragmatic approach in which potential sources of allergens, such as water leaks, were identified and remedied. According to the Hearing Officer, this pragmatic approach was supported by scientific articles regarding mold allergies. Based on test reports, testimony from Mr. Cormier, Dr. Santilli, and Dr. Danyliw, as well as several scientific articles provided by Dr. Santilli and Dr. Danyliw, the Hearing Officer concluded that A.S. "is, or is at risk of becoming, an extremely sensitive person." A.S. Decision at 24. However, the Hearing Officer also concluded that "[t]he combination of thorough, systematic cleaning and maintenance, and monitoring of possible problem areas and complaints should provide a school environment in [Madison Middle School] as clean as that of Villa Maria." *Id.* at 25.

Based on these conclusions, the Hearing Officer determined that the IEP proposed at the May 29, 2003, meeting was appropriate and that placement of A.S. at Madison Middle School, rather than at Villa Maria, accommodated A.S.'s "special education needs in the least restrictive environment, and appears to be reasonably safe, in terms of indoor air quality, for [A.S.]." *Id.* at 27. Because she found that placement at Madison Middle School was appropriate, the Hearing Officer concluded that

the Board need not reimburse the Parents for the costs of educating A.S. at Villa Maria, nor need the Board fund the purchase of educational software for use there, "even if the use [were] confined to [A.S.]'s home." *Id.* Finally, the Hearing Officer directed the PPT to convene within 30 days to review A.S.'s status and plan for her transition back to public school. *Id.* at 27. Following the Hearing Officer's decision, the Parents decided to keep A.S. at Villa Maria for the remainder of the 2003-2004 school year.

**B.     W.S.**

W.S. was born in March 1995. For his kindergarten year, 2000-2001, W.S. enrolled at Tashua Elementary School, the same school his sister attended. W.S. also had a history of allergies and asthma, and because of these health issues, his parents provided the school with emergency medications to be taken if necessary. Under the care of the family's pediatric allergist, Dr. Santilli, W.S. received allergy injections starting in the spring of 2001, as well as various allergy medications, which may have affected his classroom performance. Complaint [doc. #1] App. B at 4 [hereinafter "W.S. Decision"]. In February 2001, Dr. Santilli recommended that W.S. not participate in gym class as a result of an allergic aggravation W.S. had suffered during the class. In March 2001, describing W.S.'s allergies as "severe," Dr. Santilli reported that W.S. suffered from hives and asthma at Tashua Elementary School. Accordingly, he recommended homebound instruction for W.S. The doctor made two similar requests in April 2001. *Id.* at 5.

At the beginning of the 2001-2002 school year, Dr. Santilli recommended that W.S. be excused from gym class for the entire year. He also suggested that the school install an air filter in W.S.'s classroom, remove carpeting and underlayment, and replace ceiling tiles affected by roof leakage. In early September 2001, a Section 504 plan – named after Section 504 of the

Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504") – was developed to accommodate W.S.'s health conditions because he had been found to qualify for accommodation under Section 504.  The plan noted that W.S. was allergic to mold and peanuts, that W.S. sometimes experienced breathing problems, and that his medications might affect his ability to focus at and attend school. The plan also provided W.S. with early intervention support in reading.  *Id.*

On September 9, the Parents complained to the Board that W.S. had been allowed into the gym for a school photo in violation of his Section 504 plan, which had identified the gym as a problem area.  According to his Parents, after exposure to the gym, W.S. had complained of "heaviness when he inhales" and had "required the use of his inhaler." W.S. Ex. B-22.  Alleging that the Board had "withheld all information into [sic] present air quality and refuse[d] to provide a safe environment for [W.S.] to learn in," W.S.'s father filed a complaint with the Office of Civil Rights. W.S. Ex. B-33 at 5.

Shortly thereafter, and acting on the recommendation of Dr. Santilli, who believed W.S.'s allergic symptoms were related to the Tashua Elementary School building, the Parents removed W.S. from school and began homebound instruction.  W.S. Decision at 5.  Between November 2001 and January 2002, W.S. underwent a series of educational and psychological evaluations.  His skills were found to be within the average to low-average range.  *Id.* at 5-6.

In January 2002, a PPT convened to discuss the results of the evaluations.  The PPT determined that W.S. was eligible for special education services under the designation of Other Health Impaired ("OHI").  The PPT developed educational goals and a learning program that involved consultation between the Board's resource teacher and W.S.'s tutor.  *Id.* at 6.  The PPT met again a week later to discuss the finding of Dr. Santilli that the school's resource room showed an

acceptably low mold spore count.  The PPT developed an IEP that provided for W.S. to return to school on a part-time basis and to receive tutoring support.  The PPT also asked for a second medical opinion as to W.S.'s condition and for a psychiatric evaluation.  *Id.* at 7.

The PPT confirmed W.S.'s IEP at another meeting in early February.  *Id.* at 8.  Also in early February, the Board hired Mr. Cormier to inspect Tashua Elementary School.  As described above, Mr. Cormier reported his findings and recommendations to the Board, which convened a meeting with all parents to discuss the report.  *Id.* at 7.  Also as described above, the Board began to implement Mr. Cormier's recommendations for the Tashua Elementary School, and the Office of Civil Rights concluded its investigation into the complaints regarding both A.S. and W.S.  W.S. Ex. B-56.

W.S. returned part-time to Tashua Elementary School on February 5, 2002.  His teacher reported that W.S. had some trouble focusing.  The Parents made modifications in W.S.'s diet and lifestyle, such as moving the family dog outside the house, and conducted more testing under the supervision of Dr. Santilli.  On February 19, Dr. Santilli reported that W.S. was doing well, and that "current classroom locations should not be changed for the next 30 days."  W.S. Decision at 9. W.S.'s PPT reconvened on February 25 and reviewed his diagnostic placement.  *Id.* at 10.  Ms. Lacey-Castelot, the Parents' education consultant, evaluated W.S. and made recommendations for his IEP, including recommendations for specific educational techniques and programs.  *Id.* at 8.  The PPT recommended further educational evaluations, to which the Parents assented, as well as a psychiatric evaluation, which the Parents agreed to consider.  *Id.* at 10.

On March 5, Dr. Santilli reported that his examination of W.S. revealed that allergic symptoms had returned.  The doctor recommended resumption of homebound tutoring.  The PPT

reconvened on March 13 to review W.S.'s placement.  At this meeting, Ms. Lacey-Castelot made recommendations to the PPT, which she believed to have been rejected.  The PPT raised concerns about the quality of the testing Ms. Lacey-Castelot had performed and about her objectivity, and it discussed the possibility of further testing.  W.S. was reported to be making good progress on his educational goals.  The PPT again requested a psychiatric evaluation, as well as further information about W.S.'s medical status.  *Id.*

The following day, Dr. Santilli asked that W.S. be given at least three to four weeks of homebound instruction "until a suitable environment becomes available."  The PPT convened on March 15 and offered to place  W.S. in a different school within the district, but the PPT refused the Parents' request to test  the school's air quality before enrolling W.S. in the school.  *Id.*  The PPT also offered several options for W.S.'s return to school and requested that a physician agreed upon by both the PPT and the Parents provide a second medical opinion before resuming homebound instruction for W.S.  *Id.* at 10-11.

On March  26, 2002, another pediatric allergist, who had been selected by the Parents, reported the results of his consultation concerning W.S.  The allergist said that he could not at the time conclude that W.S.'s "problems stem from mold exposure in his school," and he recommended additional testing of the school and placement of W.S. in a different school.  *Id.* at 11.  Further educational testing performed in early April showed that some of W.S.'s skills fell within the average range, but that he had some difficulties with others.  *Id.*  The Board's assistive technology consultant evaluated  W.S.  and  produced  a  report  that  disagreed  with  some  of  Ms.  Lacey-Castelot's recommendations and suggested the use of certain educational computer programs.  *Id.* at 14.  A speech and language evaluation noted that W.S. had below-average phonological awareness skills

and suggested further monitoring.  *Id.* at 15.

The Parents consented to a second medical evaluation of W.S., which was performed by Dr. Danyliw, the same physician who performed the independent medical examination of A.S.  *Id.* at 11. Dr. Danyliw took a history from W.S.'s parents and reviewed his medical records.  *Id.* at 11-12.  Dr. Danyliw produced a report in May 2002, in which he described W.S. as being allergic to milk, house dust, cat and dog dander, soy, and mold, and as experiencing a variety of allergic reactions, ranging from mild itching to life-threatening episodes.   The report noted that "while molds in the environment may be either a contributing factor or perhaps the factor that precipitates [W.S.'s] symptoms in the school environment, the other allergens are very important in terms of both inciting symptoms and priming the examinee's immune reaction for episodic symptoms."  *Id.* at 12.  As a result, Dr. Danyliw stated that he could not say whether W.S.'s allergy to mold was "the primary offending agent[] for his symptoms."  Dr. Danyliw also stated that  "environmental controls should include not only mold spores in the air but controlling potential behaviors and exposures which could result in severe allergic reactions."  *Id.*

Based upon then-available test results, Dr. Danyliw concluded that "mold levels are significantly high enough in this particular school setting [i.e. Tashua Elementary School] to be a potential problem for the examinee."  *Id.* at 12-13.  The report recommended that the school building be remediated according to the procedures suggested by AMC and Mr. Cormier and then retested by Mr. Cormier, "who is presumably neutral in this case."  *Id.* at 13.  Dr. Danyliw suggested that it would be inadvisable to "allow[] [W.S.] to enter the [school] environment prior to reduction of the mold counts" below 1,000 spores per cubic meter, which he described as "a reasonable target."  *Id.* However, he also noted that "no one clearly knows how much exposure [to allergens] is necessary"

to produce an allergic reaction, and that "[f]igures such as 1,000 spores per cubic meters are guidelines and some individuals will react to counts lower than that level, and some individuals may be able to tolerate levels higher than that count." *Id.* Dr. Danyliw's report concluded, "There is no legitimate medical reason that I can ascertain that would preclude [W.S.] from attending another public elementary school within the school district, as long as the indoor air contains acceptable levels of mold spores." *Id.*

W.S.'s PPT convened in June to discuss the results of W.S.'s evaluations. The PPT proposed a summer reading program, which the Parents accepted, and made adjustments to W.S.'s IEP. The PPT again requested a psychiatric evaluation, but the Parents declined. Instead, the Parents asked that Tashua Elementary School undergo post-remediation testing, that W.S. be placed in another elementary school, or that he be placed in an out-of-district school. At an August meeting, the PPT recommended full-day placement for W.S. at Tashua Elementary School following remediation that the Board believed had solved the school's mold problem. Among other things, the Board had installed air conditioning and removed the carpet in two resource rooms. Responding to the Parents' concerns about the art room, the PPT assured them that the school would test the art room and install air conditioning if necessary. *Id.* at 15. W.S.'s reading and math skills were reported as "improving dramatically." *Id.* at 16.

Citing concerns for W.S.'s health and safety, the Parents requested a hearing concerning W.S.'s placement for the 2002-2003 school year. Ultimately, the Board and W.S.'s parents reached a settlement agreement, which the Court has previously described, according to which the Board agreed to help defray W.S.'s tuition at Villa Maria for the 2002-2003 year. Also as noted above, the Parents performed air quality testing at Villa Maria but never disclosed the test results to the Board.

*Id.* at 15.  W.S.'s attendance at Villa Maria during the year was very good, and he was reported as making significant progress at the school.  *Id.* at 17-18.

On May 29, 2003, the PPT convened to develop W.S.'s IEP for the 2003-2004 school year. *Id.* at 18.  Villa Maria had provided the PPT with reports and test scores from the 2002-2003 school year and included draft goals and objectives, including specific materials and programs to be used for the upcoming year.  *Id.* at 19.  The Parents requested use of the Lindamood-Bell reading program for W.S., which they believed had been successful at Villa Maria.  The PPT proposed that W.S. be placed in a newly constructed school – Frenchtown Elementary School –  and suggested a program involving remedial tutoring and additional evaluations.  However, the Parents rejected the PPT's proposal because they believed it offered less individual attention than W.S. was receiving at Villa Maria, and because the Board refused to test air quality at Frenchtown Elementary School before placing W.S. in the school.  *Id.* at 18.

By letter on August 7, 2003, the Parents requested a hearing regarding the appropriateness of W.S.'s IEP.  *Id.* at 2.  As noted above, Mary H.B. Gelfman was appointed as Hearing Officer, and she heard W.S.'s case along with A.S.'s during sixteen hearing sessions between September 2003 and February 2004.  *Id.*  The Hearing Officer considered the same ten issues in conjunction with W.S. as she had considered with regard to A.S.  *Id.* at 1-2.

On April 8, 2004, the Hearing Office issued a 25-page, single-spaced Decision, in which she concluded that the proposed IEP for W.S., including placement at Frenchtown Elementary School for the 2003-2004 school year, was appropriate.  The Hearing Officer's decision identified the same factors that had borne on her decision regarding A.S.'s placement in Madison Middle School: The PPT's IEP had incorporated suggestions from teachers at Villa Maria and Ms. Lacey-Castelot; and

although declining to prescribe the use of a specific educational program, such as the Lindamood-Bell method, or to require the provision of certain computer software programs, the PPT had demonstrated a willingness to make adjustments in the future as needed.  According to the Hearing Officer, evidence suggested that a flexible, pragmatic approach to remediation was a better way to deal with W.S.'s allergies than adopting Dr. Santilli's proposed bright-line standard of 1,000 mold spores per cubic meter.  As she did with A.S., the Hearing Office concluded that W.S. "is, or is at risk of becoming, an extremely sensitive person," but that an active and thorough cleaning regimen would produce an environment at Frenchtown Elementary School as clean as that of Villa Maria. *Id.* at 20-23.

Therefore, because she found the proposed IEP for W.S. appropriate, the Hearing Officer concluded that the Board was not responsible for funding W.S.'s placement at Villa Maria for the 2003-2004 school year.  *Id.* at 23.  The Hearing Officer also directed the PPT to reconvene in thirty days to review W.S.'s status and to plan for his transition back to public school. *Id.* at 24.  However, the Parents decided to keep W.S. at Villa Maria for the remainder of the 2003-2004 school year. *Id.* at 17.

## C.    **Procedural History**

On May 21, 2004, Plaintiffs filed this action.  *See* Complaint [doc. #1].  Plaintiffs later amended their complaint.  First Amended Complaint [doc. #8].  In their amended complaint, Plaintiffs maintain that A.S. and W.S. were denied a "free appropriate public education" by the Board's refusal to place the children at Villa Maria for the 2003-2004 school year.  Plaintiffs' amended complaint contains five counts charging the Board with violating the following laws and agreements: Count One, the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400

et seq.; Count Two, Section 504 of the Rehabilitation Act, 20 U.S.C. § 794; Count Three, Connecticut's special education law, Conn. Gen. Stat. § 10-76a et seq.; Count Four, Connecticut's Uniform Administrative Procedures Act ("UAPA"), Conn. Gen. Stat. § 4-183; and Count Five, the 2002 settlement agreement.   Plaintiffs ask this Court to reverse the decisions of the Hearing Officer, "award A.S. and W.S. a free appropriate public education," award Plaintiffs the costs of A.S.'s and W.S.'s placement at Villa Maria during 2003-2004, and provide them with other compensatory and breach-of-contract damages.   First Amended Complaint [doc. #8] at 19-22.

On October 29, Plaintiffs moved to supplement the administrative record with A.S.'s and W.S.'s educational records for the 2004-2005 school year.   Plaintiffs asserted that this evidence was relevant to the claim set forth in their First Amended Complaint and that it had not been available at the time of the Hearing Officer's decision.   Motion to Introduce Additional Evidence [doc. #19]. The Board opposed Plaintiffs' Motion.   In an on-the-record telephonic conference on January 7, 2005, the Court made clear to Plaintiffs that their supplemental evidence would be admitted only if they identified precisely what documents or information they sought to introduce and explained how those documents or information were relevant to issues decided by the Hearing Officer.   Minute Entry for Proceedings Held Before Judge Mark R. Kravitz on January 7, 2005 [doc. #23].   After further briefing, the Court denied Plaintiffs' Motion to Introduce Additional Evidence, as Plaintiffs had "neither provided the Court with the documents they seek to introduce nor sufficiently described them in a way that would permit the Court to consider Plaintiffs' motion."   Ruling and Order [doc. #34] at 3.

On February 28, Plaintiffs moved for reconsideration of the Court's ruling on their motion to supplement the record.   Motion for Reconsideration [doc. #35].   The Court again denied Plaintiffs'

motion, Ruling and Order [doc. #37], but indicated a willingness to reconsider if Plaintiffs obtained copies of the records they intended to introduce and demonstrated their relevance, Minute Entry for Proceedings Held Before Judge Mark R. Kravitz on March 8, 2005 [doc. #38].  Plaintiffs obtained educational and medical records for A.S. and W.S. and on April 25 again moved to introduce the records. Plaintiffs' Memorandum of Law in Support of Their Motion to Introduce Additional Evidence [doc. #41].  The Board once again opposed the motion.

Because Plaintiffs styled their latest motion as a memorandum of law in support of a motion that had already been denied, the Clerk mistakenly docketed the motion as a memorandum in support of an unrelated motion, Motion to Introduce Duplicate Paper Copies of the Administrative Record [doc. #40], which the Court later dismissed.  As a result, no motion to introduce evidence remains pending before the Court.   However, the Court construes Plaintiffs' still-pending Motion for Permission to File Exhibits in Support of Motion to Introduce Additional Evidence [doc. #45] as a renewal of Plaintiffs' motion to supplement the record with additional evidence.

Plaintiffs have moved for judgment on counts one, three, and four of the complaint, [doc. #49], and for summary judgment on counts two and five of the complaint [doc. #52].  The Board has opposed these motions and has moved for judgment on the administrative record on counts one through four and for summary judgment on count five [doc. #65]. On September 8, the Court heard extensive oral arguments and took all pending motions under advisement [doc. #72]. The Court also requested and received post-argument briefing.  *See* [docs. ## 73, 74, 75, & 81].

## II.

The Court will address in turn each count of Plaintiffs' complaint.

### A.      Individuals with Disabilities in Education Act

The Individuals with Disabilities in Education Act, 20 U.S.C. § 1400 et seq., "represents an ambitious federal effort" to ensure that all children are given access to a public education regardless of any disabilities they may suffer.  *Bd. of Educ. v. Rowley*, 458 U.S. 176, 179 (1982) (describing the IDEA's precursor, the Education for All Handicapped Children Act ("EAHCA")); *see id.* at 179-80 (discussing the EAHCA's legislative history).  Federal funding under the IDEA is available to states that "develop educational plans that are 'reasonably calculated' to ensure that all children with disabilities receive a 'free appropriate public education.'" *D.F. ex rel. N.F. v. Ramapo Cent. Sch. Dist.*, 430 F.3d 595, 598 (2d Cir. 2005) (quoting 20 U.S.C. § 1412(a)(1)).  A party dissatisfied with a proposed educational plan may challenge it in an administrative hearing, in which the party bears the burden of proving the plan to be inadequate.  *See Schaffer ex rel. Schaffer v. Weast*, 126 S. Ct. 528, 537 (2005).

The Second Circuit instructs that when reviewing administrative decisions under the IDEA, "a district court must make a two-step inquiry: first, the court must consider whether the state has complied with the Act's procedural requirements; second, it must consider whether the IEP is 'reasonably calculated to enable the child to receive educational benefits.'" *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1120 (2d Cir. 1997) (quoting *Rowley*, 458 U.S. at 206-07).  The district court is to make these determinations based on the preponderance of the evidence, giving "'due weight' to state administrative proceedings." *Mrs. B*, 103 F.3d at 1120 (quoting *Rowley*, 458 U.S. at 206).  This is the standard the Court has applied in evaluating Plaintiffs' IDEA claims.  Before

turning to those claims, however, the Court must address Plaintiffs' request to supplement the administrative record.

### 1.    Motion to Supplement the Record

The IDEA provides that, in an action challenging an administrative decision, a district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2).  The decision whether and to what extent to admit additional evidence is committed to the discretion of the court, "which must be careful not to allow such evidence to change the character of the hearing from one of review to a trial de novo."  *Town of Burlington v. Dep't of Educ. of Mass*, 736 F.2d 773, 791 (1st Cir. 1984), *aff'd on other grounds* 471 U.S. 359 (1985); *accord Monticello School Dist. No. 25 v. George L.*, 102 F.3d 895, 901 (7th Cir. 1996); *Susan N. v. Wilson School District*, 70 F.3d 751 (3rd Cir.1995); *Ojai Unified School District v. Jackson*, 4 F.3d 1467 (9th Cir.1993).

Plaintiffs ask this Court to supplement the record with educational and medical records for A.S. and W.S. from the 2004-2005 school year.  Plaintiffs argue that "relevant educational matters . . . have occurred after April 8, 2004, the date of the [Hearing Officer's] final decision."  Pls.' Mem. of Law in Support of Their Mot. to Introduce Additional Evidence [doc. #41] at 2.  According to Plaintiffs, in the 2004-2005 school year, both A.S. and W.S. returned to public school from Villa Maria.  Plaintiffs seek to introduce a vast array of documents relating to the children's return to public school, including the following: IEPs, minutes of PPT meetings, disciplinary records, educational evaluations conducted by the Board, report cards, attendance records, health records, notes from the school nurse, teachers' reports, notes from W.S.'s parents and doctors excusing his

absences, and psychological evaluations.  *See* Mot. for Permission to File Exs. in Support of Mot. to Introduce Additional Evidence [doc. #45] (attached exhibits).  According to Plaintiffs' attorney, "[a]t least some of the educational and medical information described is relevant to the disposition of this matter."  Pls.' Mem. of Law in Support of Their Mot. to Introduce Additional Evidence [doc. #41]  at 6.

The Board opposes Plaintiffs' motion, arguing that to allow the requested supplementation would transform these proceedings from a review of the Hearing Officer's decisions into a de novo trial.  The Board also argues that what happened during the 2004-2005 school year does not bear on whether the Board provided A.S. and W.S. with a free appropriate public education during the 2003-2004 school year.  *See* Opposition to Plaintiffs' Motion to Introduce Additional Evidence [doc. #20] at 11-12.  The Board further maintains that the Court would be required "to hear substantial additional testimony in order to understand the content and context of the requested . . . records" Plaintiffs wish to submit.  Opposition to Plaintiffs' Motion to Introduce Additional Evidence [doc. #48] at 3.  Finally, the Board insists that Plaintiffs should not be allowed to use their supplementation request as a means of evading the IDEA's exhaustion requirements.  *Id.* at 7-11.

At the outset, the Court notes that the Second Circuit has not yet addressed whether it is appropriate for a district court to consider evidence of what has occurred after a state administrative decision regarding a student's IEP – so-called "retrospective evidence" – in order to determine whether that decision denied the student a free appropriate public education.  *See D.F. ex rel. N.F.*, 430 F.3d at 598 ("This court . . . has not established whether, and to what extent, retrospective evidence of a student's progress – or the lack thereof – should be considered in determining the validity of an IEP in which the student is currently enrolled.").  Lower courts in the Second Circuit

have come to differing conclusions on the issue. *Compare J.R. v. Bd. of Educ. of City of Rye Sch. Dist.*, 345 F. Supp. 2d 386, 395 (S.D.N.Y. 2004) (" [T]he [hearing officer's] determination that the IEP at issue is reasonably calculated to enable [the student] to receive educational benefits . . . is necessarily prospective in nature; we therefore must not engage in Monday-morning quarterbacking guided by our knowledge of [the student's] subsequent progress at [her school], but rather consider the propriety of the IEP with respect to the likelihood that it would benefit [her] at the time it was devised." (internal citations and quotation marks omitted)), *and Antonaccio v. Bd. of Educ. of Arlington Cent. Sch. Dist.*, 281 F. Supp. 2d 710, 724 (S.D.N.Y. 2003) (finding that retrospective information should not be considered), *with Jean N. v. Tirozzi*, No. H-88-703 (D. Conn. Mar. 5, 1991) (decision of Eagan, Mag. J.) (permitting supplementation of the record with retrospective information to "bring[] the court up to date on the child's progress from the time of the hearing to the trial" (internal quotation marks omitted)).   In *D.F. ex rel. N.F. v. Ramapo Central School District*, the Second Circuit recently noted this absence of controlling authority, as well as decisions from other circuits holding "that inquiry into whether an IEP is valid is a necessarily *prospective* analysis."  430 F.3d at 598 (emphasis in original).  However, the Second Circuit declined to decide the issue, preferring to let the lower court consider the issue in the first instance.  *Id.* at 600.

Like most of the other courts that have considered the question, this Court is skeptical of the propriety of permitting parties to an administrative appeal to supplement the record with retrospective evidence.  However, the Court declines to decide the issue definitively, because the Court believes that the supplementation requested in this case would, on balance, prove unhelpful.  First, the evidence proffered by Plaintiffs is of questionable relevance.  Even if evidence regarding a student's progress under an IEP for a particular school year could shed any light on the validity of

a hearing officer's endorsement of the IEP for that school year, Plaintiffs ask this Court to consider evidence of A.S.'s and W.S.'s progress during an entirely different school year – the *2004-2005 school year* – to help determine whether the Hearing Officer properly endorsed the Board's proposals regarding the *2003-2004 school year*. A.S. and W.S. spent a full year at Villa Maria in between the May 29, 2003, PPT meetings of which Plaintiffs complain and the start of the 2004-2005 school year. During that period, in addition to aging and becoming more mature, according to Plaintiffs' own counsel, "both children have changed their educational program and placement" as the "direct result of a series of PPT meetings." Pls.' Mem. of Law in Support of Their Mot. to Introduce Additional Evidence [doc. #41] at 2. Therefore, any evidence regarding the children's recent progress will have at best only a tangential bearing on the relevant question raised by this case – namely, whether the Board offered Plaintiffs a free appropriate public education during the 2003-2004 school year. *See Lillbask ex rel. Mauclaire v. Sergi*, 193 F. Supp. 2d 503, 507 (D. Conn. 2002), *aff'd in part and rev'd in part on other grounds sub nom. Lillbask ex rel. Mauclaire v. State of Conn. Dept. of Educ.*, 397 F.3d 77 (2d Cir. 2005) ("Evidence as to [a student's] progress several years after an administrative decision does not necessarily show [whether] the same placement would have been appropriate several years earlier.").

Moreover, it is unclear whether the records Plaintiffs have submitted provide a thorough and accurate portrait of events occurring during the 2004-2005 school year. For instance, it cannot be determined from the documents submitted whether all relevant health records – including those that might undermine Plaintiffs' position – have been disclosed. In order to ensure a sufficiently balanced record, the Court would have to extend discovery to allow the Board to access relevant records and depose involved witnesses. While Plaintiffs do not oppose the extension of discovery for this

purpose, *see* Plaintiffs' Reply Memorandum of Law [doc. #75] at 5, the Court is reluctant at this late stage of the proceeding to turn this administrative appeal into a full-blown civil action, replete with extended discovery and trial testimony. *See Konkel v. Elmbrook Sch. Dist.*, 348 F. Supp. 2d 1018, 1021 (E.D. Wisc. 2004) ("[T]aking additional evidence delays the resolution of the dispute and undercuts IDEA's goal of finality."); *Springer*, 134 F.3d at 667 ("A lenient standard for additional evidence would have the consequence of making the whole IDEA process more time consuming . . . ."). As another judge in this District rightly observed in a similar context, "To permit ongoing and lengthy discovery of a student's current progress through his or her school records, teachers, administrators, paraprofessionals, and doctors, pending an administrative appeal, would increase the litigious nature of proceedings and undermine expediency, contrary to the command to give 'due weight' to the findings of the hearing officer . . . ." *Lillbask*, 193 F. Supp. 2d at 507.

Finally, to be truly useful to the Court, any records submitted would have to be explained and placed in context. As the Board has noted, "records . . . do not speak for themselves." Opp'n to Pls.' Mot. to Introduce Additional Evidence [doc. #48] at 7. Indeed, that is why the Hearing Officer in this case held sixteen days of hearings. This Court lacks expertise in the medical and educational fields and would require a substantial amount of testimony to give meaning to the reports and records Plaintiffs seek to introduce in order to determine whether those records have any bearing on the issues addressed by the Hearing Officer. In effect, the Court would have to conduct a full administrative hearing regarding the 2004-2005 school year in order to determine the relevance of this information to the 2003-2004 school year. To do so would have the doubly impermissible result of converting these proceedings into a de novo trial about a school year that is not even at issue. *See Springer v. Fairfax County Sch. Bd.*, 134 F.3d 659, 667 (4th Cir. 1998) ("A lax interpretation of

'additional evidence' would 'reduce the proceedings before the state agency to a mere dress rehearsal by allowing appellants to transform the Act's judicial review mechanism into an unrestricted trial de novo.'" (quoting *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 997 (1st Cir.1990))); *see also Walker County School Dist. v. Bennett ex rel. Bennett*, 203 F.3d 1293, 1298 (11th Cir. 2000) (noting that "the conservation of judicial resources" is an "important concern" that a court should "weigh heavily" when deciding whether to supplement the record (internal quotation marks omitted)).

Nor have Plaintiffs demonstrated that there were procedural deficiencies during the administrative hearing that would justify supplementation of the record before the Court.  For instance, Plaintiffs allege no "gaps in the administrative transcript owing to mechanical failure," "unavailability of a witness" during the hearing, or "improper exclusion of evidence by the administrative agency."  *Burlington*, 736 F.2d at 790; *see Beth B. v. Van Clay*, No. 00 C 4771, 2001 WL 585142, at *1 (N.D. Ill. Feb. 12, 2001) ("No procedural infirmities are evident here. The parties had ample opportunity to present their positions before the hearing officer.").  To the contrary, it appears that Plaintiffs were given every opportunity before the Hearing Officer to make as full and complete a record as they desired.  Therefore, even if it were otherwise permissible for an IDEA plaintiff to rely on retrospective evidence, the Court exercises its discretion to deny Plaintiffs' request to supplement the record with the retrospective evidence they seek to introduce.

### 2.    IDEA's Substantive Requirements

Plaintiffs do not dispute that the Board complied with the IDEA's procedural requirements.  *See* Memorandum of Law in Support of Plaintiffs' Motion for Judgment [doc. #50] at 14.[3]  They

---

[3] At other points in the same brief, Plaintiffs do appear to make arguments addressed to the Board's compliance with the IDEA's procedural requirements.  For instance, Plaintiffs allege that while "Villa Maria had presented the Defendant with copies of its 2002-2003 progress and

contend, however, that the Board's actions violated the IDEA's substantive guarantee of "individualized educational program[s] developed through the Act's procedures reasonably calculated to enable [A.S. and W.S.] to receive educational benefits." *Rowley*, 458 U.S. at 207.

The IDEA does not require a school district to furnish every service necessary to maximize a child's educational potential. *See id.* at 197 n.21.  Instead, the IDEA is satisfied if the school district "provides an IEP that is 'likely to produce progress, not regression,' and if the IEP affords the student with an opportunity greater than mere 'trivial advancement.'" *Cerra*, 427 F.3d at 195 (quoting *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 130 (2d Cir.1998)).  In determining whether sufficient progress under a proposed plan is likely, a district court "must examine the record for any 'objective evidence' indicating whether the child is likely to make progress or regress under the proposed plan." *Walczak*, 142 F.3d at 130 (quoting *Mrs. B.*, 103 F.3d at 1121).  However, in doing so, a district court must be careful not to "substitut[e] its judgment for that of the agency experts and the hearing officer." *Briggs v. Bd. of Educ.*, 882 F.2d 688, 693 (2d Cir. 1989).  "In order to avoid impermissibly meddling in state educational methodology," a district court must accord substantial deference to the decision of the administrative hearing officer, who has "special expertise in making judgments concerning student progress." *Cerra*, 427 F.3d at 195 (internal quotations omitted); *see also Lillbask ex rel. Mauclaire v. State of Conn. Dept. of Educ.*, 397 F.3d 77, 82 (2d Cir. 2005). As the Second Circuit recently emphasized, "We have not hesitated to vacate district court opinions

---

evaluation reports for A.S. . . . the Defendant was entirely dismissive of any of Villa Maria's recommendations for the 2002-2004 school year." Memorandum of Law in Support of Plaintiffs' Motion for Judgment [doc. #50] at 21.  To the extent that this and similar allegations by Plaintiffs relate to the procedure by which the Board formulated A.S.'s and W.S.'s IEPs – rather than to the IEPs' content –  the Court does not consider them in light of Plaintiffs' express statement that they do not allege a procedural violation.

where the district court 'erred in substituting its judgment for that of the agency experts and the hearing officer.'" *Cerra*, 427 F.3d at 195 (quoting *Briggs v. Bd. of Educ.*, 882 F.2d 688, 693 (2d Cir. 1989)).   Furthermore,   "[j]udicial deference is particularly appropriate when" – as is the case here – "the state hearing officer's review has been thorough and careful." *Sherman v. Mamaroneck Union Free Sch. Dist.*, 340 F.3d 87, 93 (2d Cir. 2003) (alteration in original) (internal quotation marks omitted).   That said, a hearing officer's interpretations of statutes or the federal constitution are afforded no deference.  *Lillbask*, 397 F.3d at 82.

Plaintiffs assert two general arguments in support of their claim that the Board violated the IDEA's substantive requirements.  First, Plaintiffs argue that the educational programs proposed in the children's IEPs for the 2003-2004 school year were not sufficiently responsive to the Parents' concerns or to input provided by Ms. Lacey-Castelot and Villa Maria.  Second, Plaintiffs maintain that placement in the Board's schools in 2003-2004 would not have been safe for A.S. or W.S. unless air-quality testing *first* demonstrated sufficiently low levels of environmental allergens in those schools.

### a.   Education Methodology

With respect to their first argument, Plaintiffs assert that the Board erred in rejecting educational methodologies that Plaintiffs say had produced demonstrable progress for A.S. and W.S. at Villa Maria.  In particular, Plaintiffs believe that the proposed IEPs should have incorporated "provision of [the] Lindamood-Bell program of instruction, the use of a small student/teacher ratio and assistive technology."  Mem. of Law in Support of Pls.' Mot. for J. [doc. #50] at 20; *id.* at 21. Plaintiffs also take issue with the Hearing Officer's statement that she "lacked authority to order specific educational methodologies."  *Id.* at 19.

At the outset, the Court notes that the Second Circuit has cautioned that when "conduct[ing] an independent review of the sufficiency of an IEP under the IDEA," a court should not "impermissibly meddl[e] in state educational methodology." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 383 (2d Cir. 2003) (internal quotation marks omitted).  Only objective evidence that a school board's chosen program is deficient will permit a court to overrule a hearing officer's decision to the contrary.  *See id.*  Therefore, even if the Court were convinced that the Parents were correct that their preferred educational program was superior to the Board's, that fact alone would be insufficient to justify granting judgment for Plaintiffs.  *See Mrs. B.*, 103 F.3d at 1121 ("A court may not second-guess state educators' policy decisions in the effort to maximize a handicapped child's educational potential.").  Instead, Plaintiffs must demonstrate on the basis of objective evidence in the record that the Board's chosen program was deficient.  *Grim*, 346 F.3d at 383.  That is a standard Plaintiffs have not met.

On the evidence presented, the Court agrees with the Hearing Officer that the IEPs developed for A.S. and W.S. at the May 29, 2003, PPT meetings were appropriately designed to advance their educational progress. Though A.S.'s classes may not have been as small as her Parents would have preferred, A.S.'s IEP included team-taught classes, in which a special education teacher would have instructed the class alongside the regular education teacher, in order to provide A.S. with additional support.  A.S. Ex. B-92 at 5; 11/11/03 Hearing Tr. at 98-99 (testimony of Ms. Hollo).  The IEP also included counseling with the school's social worker to ease A.S.'s transition to middle school.  A.S. Ex. B-92 at 5; 11/11/03 Hearing Tr. at 99-100 (testimony of Ms. Hollo).  The PPT also drafted a series of concrete goals for A.S. spanning a variety of skills, such as reading fluency, writing organization, math computation, and fine-motor performance, all based on A.S.'s progress at Tashua

Elementary School and Villa Maria.  A.S. Ex. B-92 at 6-12; 11/11/03 Hearing Tr. at 101 (testimony of Ms. Hollo).  In addition, the PPT recommended that the Board's speech and occupational specialists provide A.S. with extra help, and that A.S. participate in a summer reading program.  The IEP, and the testimony of those who created it, evidence a thoughtful, individually tailored effort to marshal the Board's resources on A.S.'s behalf.  Certainly, there was no objective evidence that the Boards' program for A.S. was deficient.

W.S.'s IEP appears similarly well suited to promote his educational development.  It called for W.S. to receive substantial one-on-one attention, including five hours a week in the resource room with the special education teacher and an hour-and-a-half per week with the speech and language pathologist to improve his language skills.  W.S. Ex. B-85 at 17.  In the words of Judith Elkies, a speech and language coordinator for the Board, the services proposed for W.S. represented "a highly cohesive, colaborative program" addressing multiple aspects of his reading and comprehension.  12/16/03 Hearing Tr. at 189 (testimony of Ms. Elkies).  The Court agrees.  The PPT also set forth a series of action-oriented goals, combining those advocated by the staff of Villa Maria as well as those advanced by the Board's experts.  W.S. Ex. B-85 at 5-16; 11/19/03 Hearing Tr. at 219-20 (testimony of Ms. Samler).  Two such goals explicitly provided that W.S. would use the Lindamood-Bell method that was preferred by the Parents.  W.S. Ex. B-85 at 5-6.  The record thus supports the Hearing Officer's conclusion that the IEP presented at the May 29, 2003, PPT meetings appropriately accommodated W.S.'s educational needs. Once again, there was no objective evidence that the Board's program for W.S. was deficient.

Moreover, frequent testing of the children, coupled with progress reports from teachers and special education counselors, confirmed that both children had made progress in the Board's schools.

For instance, reports for A.S. dated February, April, June, and November 2001 reported appropriate progress for reading, writing, math, and language goals, as well as goal mastery in several objectives. A.S. Ex. B-32 at 1-5.  Testimony from the Board's special education teacher confirmed that A.S.'s skills had advanced satisfactorily.  1/27/04 Hearing Tr. at 188 (testimony of Ms. Ward).  The March 13, 2002, PPT meeting minutes indicate that W.S.'s "[r]esource teacher felt that [he] was making nice progress on his goals."  W.S. Ex. B-58 at 3.  And at the August 16, 2002, PPT meeting, W.S.'s math and reading skills were reported as "improving dramatically."  W.S. Ex. B-79 at 3.  These reports and others demonstrate appreciable progress by A.S. and W.S. and suggest that further progress at the Board's schools was likely.

The Board had also demonstrated a willingness to modify its educational programs when necessary to adapt to changing circumstances, having modified A.S.'s and W.S.'s IEPs on numerous occasions during the 2001-2002 school year (the last year in which the children were enrolled at the Board's schools).  *See, e.g.*, A.S. Exs. B-29, B-33, B-39, B-60, B-79 (October and November 2001, January, March, and June 2002 PPT meetings); W.S. Exs. B-29, B-39, B-45, B-58, B-74 (November 2001, January, February, March and June 2002 PPT meetings).  The Board had also demonstrated a willingness to provide each child with the assistance of specialists when needed.  *See, e.g.*, A.S. Decision at 4, 9, 10, 13, 14; W.S. Decision at 6, 10, 11, 14.  The Hearing Officer concluded – and the conclusion was well founded in the evidence – that "[t]he PPT . . . demonstrated willingness to further accommodate [A.S. and W.S.], if necessary, after [their] enrollment."  A.S. Decision at 23; W.S. Decision at 20.  Viewing the record as a whole, the Court finds no support for the notion that the Board's proposed IEPs were likely to produce "regression" or "mere trivial advancement."  *See Cerra*, 427 F.3d at 195 (internal quotation marks omitted).

To be sure, Plaintiffs have offered evidence that their preferred educational methodologies, which were implemented to their satisfaction at Villa Maria, had resulted in progress for A.S. and W.S. In particular, they tout the benefits of the Lindamood-Bell reading program and urge that this Court order the Board to make that program available to A.S. and W.S. *See* Mem. of Law in Support of Pls.' Mot. for J. [doc. #50] at 24. For its part, the Board *did* incorporate into the children's IEPs many suggestions from the Parents, including the use of educational computer software and some Lindamood-Bell instruction, albeit not to the extent that the Parents would have liked. *See, e.g.*, W.S. Ex. B-85 at 4 (noting that W.S. "[b]enefits from Lindamood[-]Bell"); *id.* at 5-6 (incorporating use of the Lindamood-Bell program into two "measurable annual goal[s]"); 11/19/03 Hearing Tr. at 220 (testimony of Ms. Samler) (explaining that an IEP goal "was written so that one would have to use . . . the Linda[m]ood[-]Bell Phoneme Sequencing Program and the Linda[m]ood[-]Bell Visualizing and Verbalizing Program"); A.S. Ex. B-92 at 10 (providing for A.S. to use "software such as Inspiration").

However, the Board's educational consultants testified that in their judgment it was wisest not to be tied to only one particular program, such as the Lindamood-Bell program, and thereby foreclosed from using others. As the Hearing Officer explained, "[t]he Board's Reading Consultant uses many programs, selecting the programs that from her professional experience . . . address the specific difficulties of each student referred from reading support." A.S. Decision at 25; *see also id.* at 9; W.S. Decision at 22; 11/19/03 Hearing Tr. at 220-21 (testimony of Ms. Samler) ("[The PPT] didn't want to be boxed in by using one program . . . ."); 12/16/03 Hearing Tr. at 178 (testimony of Ms. Elkies) (explaining that the PPT wanted to use the Lindamood-Bell program "as part and parcel of a comprehensive reading program, not isolated"); *id.* at 190-91 (noting that the PPT "d[id]n't want

to be constrained by one program," but instead wanted the flexibility to change approaches if another proved effective). This is precisely the sort of dispute about educational policy which this Court ought not interfere with so long as the Hearing Officer's resolution is supported by the record. *See Lillbask*, 397 F.3d at 82 (explaining that a court should be "mindful that the judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy" (alteration in original) (internal quotation marks omitted)); *Grim*, 346 F.3d at 383 (admonishing a district court not to "cho[o]se between the views of conflicting experts on a controversial issue of educational policy . . . in direct contradiction of the opinions of state administrative officers who had heard the same evidence"). Here, the Hearing Officer's conclusions are amply supported by the record evidence.

Plaintiffs also maintain that the Hearing Officer's decisions were invalid because she improperly cited to the Connecticut Department of Education's 1999 Guidelines for Assistive Technology (the "Guidelines"). According to Plaintiffs, the Hearing Officer relied on the Guidelines, which provide that a school need not purchase a high-tech device if a low-tech device solves the same problem, in reaching her conclusion that the Board was not obligated to fund Plaintiffs' requested assistive technology. Plaintiffs argue that the Hearing Officer's reliance on the Guidelines was erroneous because the Guidelines were never enacted as a statute or regulation, and Plaintiffs received no warning that the Hearing Officer would consult them. Mem. of Law in Support of Pls.' Mot. for J. [doc. #50] at 19. Moreover, Plaintiffs assert that the propriety of the Hearing Officers' reliance on the Guidelines presents a legal issue for which the Hearing Officer should receive no deference.

The Court doubts Plaintiffs' assertion that the Hearing Officer was forbidden from

referencing the Guidelines, a freely accessible internet resource. *See* Connecticut State Department of Education and Connecticut Birth to Three System, Guidelines for Assistive Technology (1999), http://www.state.ct.us/sde/deps/special/AT_Guidelines.pdf (last visited December 19, 2005). Even if referencing the Guidelines were inappropriate, however, the Hearing Officer did so only to "confirm[] the position of the Board's [Assistive Technology] consultant." A.S. Decision at 26; W.S. Decision at 22. The Guidelines thus do not appear to have driven the Hearing Officer's conclusions, but merely confirmed them.

In any event, the Court finds that the Hearing Officer's conclusions regarding assistive technology were supported by substantial evidence in the record, excluding the Guidelines. The Board's assistive technology consultant testified that "it's often preferable to use [a] low tech tool because the kid can learn it faster, they can use it in more environments, it is better accepted especially by older children." 1/21/04 Hearing Tr. at 8 (testimony of Ms. Sweeny). Moreover, the technology consultant's approach comports with the IDEA's goal of "mainstreaming," students with disabilities "[t]o the maximum extent appropriate," *see* 20 U.S.C. § 1412(a)(5), a goal which the Second Circuit has interpreted "as a requirement that special education be provided in the 'least restrictive setting consistent with a child's needs,'" *Grim*, 346 F.3d at 379 (quoting *Walczak*, 142 F.3d at 122); *see* 1/21/Hearing Tr. at 10 (testimony of Ms. Sweeny) ("[T]he majority of us who are doing national work in assistive technology . . . believe that under [a least-restrictive-environment approach] we really have to stress low tech tools first as a [least-restrictive-environment] issue."). Furthermore, as the Hearing Officer noted with approval, the proposed IEPs for A.S. and W.S. recommended the use of certain assistive technology, *see* A.S. Ex. B-92 at 10 (providing that A.S. "will use a pre-write outline on software such as Inspiration"); W.S. Ex. B-85 at 6 (providing that

W.S. will use "the Story Grammar Marker"); *id.* at 7, 11 (providing that W.S. will use "Math Pad" and "K[urzweil] 3000"), just not the full range of assistive technologies Plaintiffs would have preferred. Plaintiffs do not point to any objective evidence in the record establishing that, absent access to the assistive technology they seek, A.S. and W.S. would have been unable to make the sort of educational progress the IDEA requires. *See Cerra*, 427 F.3d at 195. That the Hearing Officer sided with the PPT and the Board's assistive technology consultant – rather than with Plaintiffs, Villa Maria, and Ms. Lacey-Castelot – hardly renders her decisions undeserving of deference. *See id.* Therefore, the Court concludes that the Hearing Officer's citations to the Guidelines, even if erroneous, do not justify overturning her decisions as to the appropriateness of the Board's chosen educational programs for A.S. and W.S.

**b.    Health Concerns**

Plaintiffs also argue that the proposed IEPs denied A.S. and W.S. a free appropriate public education because the Board did not sufficiently account for the children's health sensitivities. It is undisputed that at Tashua Elementary School, both children experienced allergic reactions due to the relatively high level of mold spores in the air. According to Plaintiffs, these reactions, as well as the fear of future reactions and the side-effects of medications taken to combat them, interfered with the children's ability to make educational progress at the Board's schools. Despite the recommendations of medical professionals, such as Dr. Santilli, the Board refused to conduct air quality testing at its schools before the children's enrollment to ensure that mold spores were within what the Parents considered to be acceptable levels. Therefore, the Parents argue, the Board denied A.S. and W.S. access to a free appropriate public education, and the Board should be required to fund the children's placement at Villa Maria for the 2003-2004 school year.

Issues of student safety, such as Plaintiffs' claim that the Board's schools are unhealthy for A.S. and W.S, may properly be raised in a substantive challenge under the IDEA.  As the Second Circuit has explained, the Act's "broad language suggests that Congress did not intend to exclude from consideration any subject matter – including safety concerns – that could interfere with a disabled child's right to receive a free appropriate public education."  *Lillbask*, 397 F.3d at 93. Therefore, if the proposed placement of A.S. and W.S. in the Board's schools threatened their health in a manner undermining their ability to learn, such a placement would deny the children the benefits that the IDEA guarantees.

Plaintiffs first suggest that the Hearing Officer declined to exercise jurisdiction over their safety claims.  Mem. of Law in Support of Pls.' Mot. for J. [doc. #50] at 22.  The Court disagrees. In fact, the Hearing Officer made extensive factual findings regarding the children's health histories, the Board's efforts to accommodate their sensitivities, and the prospect for safe placement at the Board's schools.  Indeed, the Hearing Officer emphasized that "[d]uring future discussions of placements for [A.S. and W.S.], [their] sensitivity to poor air quality must continue to be an issue." A.S. Decision at 26; W.S. Decision at 23.  Seizing on this sentence, Plaintiffs argue in the alternative that, even if the Hearing Officer advocated future vigilance, she insufficiently addressed the then-prevailing need to prevent health crises from arising in the first place.  Mem. of Law in Support of Pls.' Mot. for J. [doc. #50] at 23 ("The Hearing Officer's conclusion that *future* discussions of placements for each [student] due to sensitivity to poor indoor air quality must continue to be an issue was hardly an adequate response to the Plaintiffs' *current* safety concerns that were presented by the [students'] parents at the May 29, 2003 PPT meeting." (emphases  in original) (internal citations omitted)).

-45-

The Court is not persuaded.  The record reveals that the placement of A.S. at Madison Middle School and W.S. at Frenchtown Elementary School were, as the Hearing Officer concluded, "reasonably safe, in terms of indoor air quality," for the children.  A.S. Decision at 27; W.S. Decision at 23.  The Board had adopted the Environmental Protection Agency's Tools for Schools Program, which is a comprehensive program designed to help schools improve the indoor air quality at their facilities.  An Indoor Air Quality Status Report prepared by the Board's Plant Operations manager described the Board's efforts, incorporating the Tools for Schools approach, to ensure that Madison Middle School's air quality is acceptable.  *See* A.S. Ex. B-95.  These efforts involved the routine replacement of air filters, the elimination of stained ceiling tiles, the removal of contaminated carpeting, and the cleaning of each unit ventilator in the school, as well as a diagnostic "walk-through" to identify potential concerns.  *See id.*  Furthermore, Mr. Cormier testified that he had conducted an unscheduled inspection of Madison Middle School that confirmed that the school's unit ventilators and air filters were clean.  12/18/03 Hearing Tr. at 73-74 (testimony of Mr. Cormier).  He observed that the school building was constructed with materials, such as concrete block walls and terrazzo floor tiles, that are unlikely to breed allergens, and as a result, Mr. Cormier gave the building an overall rating of "very clean." *Id.* at 75-77.  Significantly, he also noted that an effective feedback mechanism was crucial to maintaining good air quality, and testified that formalized procedures existed for school staff to report any air quality issues and that the staff seemed to be aware of those procedures. *Id.* at 68-70.

Evidence also suggests that Frenchtown Elementary School was safe for W.S.  The Frenchtown school was only recently constructed and it opened to students in time for the 2003-2004 school year.  Mr. Cormier testified that the building's construction complied with his health safety

recommendations, such as the use of a sloped roof.  11/18/03 Hearing Tr. at 78 (testimony of Mr. Cormier).  Also, the building's interior was designed to minimize areas that might harbor allergens, with no carpets near the bathrooms or drinking fountains and with no carpeting in the hallways.  *Id.*; *see also id.* ("There's no carpeting in the hallway.  That's critical.  That's important.").  Mr. Cormier testified that the school had implemented appropriate procedures to protect air quality, and that "[t]here was nothing that [he] saw . . . in the building that indicated that there may be a problem or . . . an existing problem."  *Id.* at 81.  Far from rebutting this conclusion, Plaintiffs offered no evidence that placement at Frenchtown Elementary for the 2003-2004 school year would have been unsafe for W.S..  *See* 10/20/03 Hearing Tr. at 75 (testimony of Mr. W.S.) ("So you don't have any information to suggest that the air quality is problematic or unsafe at the building, correct?"  "No, I have no information."); 11/19/03 Hearing Tr. at 76 (testimony of Dr. Santilli) (admitting that he did not "have a clue" whether Frenchtown would be safe for W.S.).

Plaintiffs respond, however, that Madison Middle School and Frenchtown Elementary School could not be proven safe unless they were subjected to air quality testing – testing that the Board refused to conduct or permit before placing the children in the schools.  The crux of Plaintiffs' argument is that the IEPs proposed at the May 29, 2003, PPT meetings did not accommodate the Parents' reasonable request for pre-placement air quality testing.  Dr. Santilli recommended that neither child be enrolled in any school until air quality tests showed mold levels below 1,000 spores per cubic meter, and Dr. Danyliw agreed that to enroll them before testing would be inadvisable.  Given these recommendations, as well as the children's history of sensitivity at Tashua Elementary School, Plaintiffs argue that the Board's refusal to test air quality prior to placement amounted to a denial of a free appropriate public education.

-47-

The Court is not unsympathetic to the Parents' concerns. Certainly, given the experiences of their children at Tashua Elementary School, the Parents were not unreasonable to be concerned about the environment in the new schools and to request testing to be done before exposing their environmentally sensitive children to the new schools. And, of course, the Board might have avoided this dispute entirely had it acceded to the Parents' request. However, the Hearing Officer found, and on the evidence presented the Court agrees, that the Board did not deny A.S. and W.S. meaningful access to a public education merely by refusing to conduct pre-placement air quality testing at Madison Middle School and Frenchtown Elementary School. The Court reaches this conclusion for several reasons.

First, substantial evidence in the administrative record supports the Hearing Officer's conclusion that no uniform standard for air quality has been accepted by the scientific community. Though Dr. Santilli set the bar at 1,000 mold spores per cubic meter, Mr. Cormier testified that no such standard had been adopted by the industrial hygiene industry. 11/18/03 Hearing Tr. at 64-65 (testimony of Mr. Cormier). Indeed, Mr. Cormier testified that no meaningful uniform standard for biological allergens can presently be developed due to the variety of allergen types and individual susceptibilities. *Id.* at 65. This testimony is consistent with the report on Tashua Elementary School prepared by Mr. Cormier during the 2001-2002 school year, in which he wrote that:

> There are no federal or state standards that specify acceptable concentrations of biological origin other than those studied in certain manufacturing environments. The American Conference of Governmental Industrial Hygienists . . . does not currently support any existing numerical criteria for interpreting data on biological agents in non-manufacturing environments.

A.S. Ex. B-44 at 4. Mr. Cormier explicitly rejected Dr. Santilli's spore-counting approach and suggested that Dr. Santilli lacked the education and training necessary to properly assess air quality.

11/18/03 Hearing Tr. at 66-67 (testimony of Mr. Cormier).  Mr. Cormier is an industrial hygienist with over twenty-five years of experience in the field, as well as numerous professional certifications and associational memberships, A.S. Ex. B-116 (curriculum vitae).  As such, his testimony about the virtues of a problem-solving approach deserves substantial deference.

Other evidence confirms Mr. Cormier's conclusions.  Dr. Danyliw was an experienced and independent expert.  His reports noted that he was "unaware of any agreement on an objective measure of 'safe' levels of mold."  A.S. B-77 at 5.  He testified that he recommended reducing the mold spore count below 1,000 as a "reasonable compromise" to accommodate the insistence by the Parents and  Dr. Santilli on this number, but he expressly observed that no scientific studies supported their proposed standard – which he deemed "arbitrary."  12/16/03 Hearing Tr. at 26-27 (testimony of Dr. Danyliw). As Dr. Danyliw put it, "I think for somebody to say that the environment is unsafe purely on the basis of a spore count is cavalier at best.  So I think that that shouldn't be said because I don't think there's a science to back it." *See id.* at 29. Dr. Danyliw also questioned the validity of articles Dr. Santilli cited in support of the 1,000 mold spores metric, noting that the information in some articles had been misinterpreted by Dr. Santilli and that other articles were not based on empirical evidence. *Id.* at 27-28.  Thus when asked point-blank whether "there any reason from your perspective for the school to rely on Dr. Santilli's recommendation" of a standard of 1,000 mold spores per cubic meter, Dr. Danyliw responded, " No." *Id*. at 110.  Dr. Danyliw also gave the following testimony before the Hearing Officer after conducting a review of the medical literature on the subject:

> Q.    Okay.  As you sit here today, are you aware of any medical or scientific literature establishing the 1,000 mold spore or colony forming units per cubic meter level as a measurement of safe or unsafe level of exposure?
> A.    Well, scientific, no.  There have been a couple of reports out there which

> implies that we should get mold spore counts below a thousand.  Most
> notably, Dr. Santilli's own article which was brought to my attention.  *But
> those are not based on any science. And current thinking of people far more
> knowledgeable in this field than myself have repeatedly indicated that there
> are no standards*.  We really don't know what a safe level is.  And that a
> thousand cubic – a thousand colony forming unit per meter squared is
> arbitrary.

*Id.* 26-27 (emphasis added).   Finally, the Hearing Officer cited to other scientific articles casting

doubt on the soundness of a fixed mold-spore standard.  *See* A.S. Decision at 24 (citing studies);

W.S. Decision at 20-21 (same).  Notably, the Parents never provided the Board or Hearing Officer

with any results from air-quality testing that they supposedly conducted at Villa Maria.  Nor did they

present any rebuttal testimony from an industrial hygienist (like Mr. Cormier) or from an a specialist

in environmental medicine (like Dr. Danyliw).

Second, evidence in the record supports the more flexible, problem-solving approach

advocated by Mr. Cormier and adopted by the Board and the Hearing Officer.  Mr. Cormier

explained that the best way to evaluate whether a school was safe would be to conduct a

comprehensive investigation into the school's building materials, maintenance history, cleaning

procedures, and remediation protocols.  12/18/03 Hearing Tr. at 58-59 (testimony of Mr. Cormier).

As Mr. Cormier explained, it is most sensible to "focus more on doing the removal or remediation

of [problem] materials or of the problem [itself] . . . rather than . . . spend time on [collecting] air

samples."  *Id.* at 82; *see also* A.S. Decision at 24 ("In general, it is not necessary to measure the

quantity of mold spores in the air of a home or school.  If mold is found, the occupants should start

by determining the source of the water problem and fixing it." (quoting R.A. Etzel, *Indoor Air

Pollutants in Homes and Schools*, 48 Pediatric Clinics of North America 1153 (2001))).

Third, the record shows that the Board had taken steps to implement this problem-solving

-50-

approach.  As explained above, the Board had initiated comprehensive plans at both Madison Middle

School and Frenchtown Elementary School to remediate known health risks and prevent future ones

from arising.  Dr. Danyliw testified that the Board had developed appropriate health plans for A.S.

and W.S. to ensure a rapid and proper response to any health incidents.  12/16/03 Hearing Tr. at 42-

48 (testimony of Dr. Danyliw).  According to Dr. Danyliw, the procedures in place suggested that

there was "no medical reason" why the Madison Middle School and the Frenchtown Elementary

School would be unsafe for the children or why the schools should be tested before permitting the

children to attend the schools.  *Id.* at 43 (regarding W.S.); *see id.* at 46 (regarding A.S.).  Nor did

Plaintiffs present any evidence that other children had experienced any allergy problems at either

Frenchtown Elementary School or Madison Middle School.

Finally, the Board's actions demonstrate a willingness to accommodate the children's needs

should problems occur.  The Board developed a Section 504 plan for W.S. to accommodate his

environmental sensitivities.  The plan called for him to receive "preferential seating," for him to be

excused from gym class (due to allergens in the gymnasium), for him to "sit at the peanut free table

in [the] cafeteria," and for the Board to install special filters in his classroom to improve air quality.

W.S. Ex. B-21 at 1.  When A.S. and W.S. developed adverse symptoms at the start of the 2001-2002

school year, their PPTs developed education plans that allowed them to study at home.  A.S.

Decision at 9; W.S. Decision at 6-7.  The Board also permitted Dr. Santilli to conduct on-site testing

when problems developed.  *Id.* at 5.  And, as detailed above, the Board conducted testing and

performed extensive remediation at Tashua Elementary School on multiple occasions. A.S. Decision

at 8, 11-12, 18-19; A.S. Ex. B-58 at 4-7.  Indeed, Plaintiffs' attorney admitted at oral argument that

Plaintiffs had no problems with the approach taken by the Board during the 2001-2002 and 2002-

2003 school years, conceding that the Board had been appropriately responsive.

In sum, substantial evidence supports the Hearing Officer's conclusion that the placement of A.S. and W.S. at the Madison Middle School and Frenchtown Elementary School was reasonably safe despite the Board's refusal to conduct pre-placement air-quality testing. The Court recognizes that evidence exists on both sides of the issue, and the Parents were understandably inclined to favor Dr. Santilli's position rather than Mr. Cormier and Dr. Danyliw's. Nevertheless, "while [the school district's] and [the parent's] experts disagreed, IDEA requires great deference to the views of the school system rather than those of even the most well-meaning parent." *A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 328 (4th Cir. 2004). The weight of the evidence thus convinces the Court that Plaintiffs have not met their burden of proving that the Board's proposed IEPs were inadequate. Therefore, because the Court finds the Board's proposals educationally appropriate and reasonably safe, the Court concludes that A.S. and W.S. were not denied a free appropriate public education during the 2003-2004 school year and that as a result, the Board is not responsible for reimbursing the Parents for the children's placement at Villa Marie for that school year.

**B.     Section 504**

The Rehabilitation Act of 1973 "was enacted to promote . . . the inclusion and integration of persons with disabilities into mainstream society." *J.D. ex rel. J.D. v. Pawlet School District*, 224 F.3d 60, 70 (2d Cir. 2000). Section 504 of the act provides as follows:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C. § 794(a). This provision means that no student may be denied access to an appropriate education because of his or her disabilities, no matter how severe. *See* 34 C.F.R. § 104.33(a) ("A

recipient [of federal funds] that operates a public elementary or secondary education program or

activity shall provide a free appropriate public education to each qualified handicapped person who

is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap.").  To

establish a Section 504 violation, a plaintiff must show:

> (1) that the student is disabled; (2) that the student is "otherwise qualified" to
> participate in school activities; (3) the school or the board receives federal financial
> assistance; and (4) the student was excluded from participation in, denied the benefits
> of, or subject to discrimination at, the school.

*Gabel ex rel. L.G. v. Board of Educ. of Hyde Park Central School Dist.*, 368 F. Supp. 2d 313, 334

(S.D.N.Y. 2005) (citing *D'Amico v. City of New York*, 132 F.3d 145 (2d Cir.1998)).  Whereas the

IDEA focuses on the content of a student's educational program, Section 504 combats discrimination

and safeguards "equal access to the school's programs." *J.D. ex rel. J.D.*, 224 F.3d at 70; *see Gabel*

*ex rel. L.G.*, 368 F. Supp. 2d at 333-34.

### 1.    Supplementation of the Record

At the Court's request, the parties provided supplemental briefing regarding whether, even

if the Court denied Plaintiffs' request to supplement the record with respect to their IDEA claims,

Plaintiffs should nevertheless be allowed to supplement it with additional evidence bearing on their

Section 504 claims.  At oral argument, Plaintiffs' counsel had suggested that Plaintiffs' Section 504

claims were not confined, as their IDEA claims were, to the 2003-2004 school year.  However, in

their supplemental briefing, Plaintiffs disavowed any intention to pursue claims for discrimination

taking place after the 2003-2004 school year.  *See* Plaintiffs' Reply Memorandum of Law [doc. #75]

at 5.  "Instead, the Plaintiffs believe that the 2004-05 educational records are relevant in evaluating

whether the Defendant had engaged in discrimination during the previous school years."  *Id.*

Plaintiffs suggest that because 20 U.S.C. § 1415(i)(2) – the provision governing supplementation of

the record for IDEA claims – does not apply to Section 504 claims, "the Court's review of evidence under Section 504 is not as restricted as the judicial review function within the IDEA."  Pls.' Reply Mem. of Law [doc. #75] at 5.

Plaintiffs seek to supplement their Section 504 claims with precisely the same educational and health records they sought to introduce in support of their IDEA claims.  The permissibility of supplementing the record with such "retrospective" evidence under Section 504 is even less clear than in the IDEA context.  Indeed, the extent to which a Section 504 claimant is *ever* entitled to supplement the administrative record is questionable.  *See, e.g., Monticello School Dist. No. 25 v. George L.*, 102 F.3d 895 (7th Cir. 1996) (denying plaintiffs' request to supplement the administrative record with respect to their Section 504 claim because "[w]e see nothing in the case law or the statute that says that a court must hear additional evidence on counterclaims not brought under the IDEA, and refuse to draw that conclusion in this case").

However, even if supplementation were permissible  in appropriate circumstances, this case does not present such circumstances.  Plaintiffs' Section 504 claims rest on their allegations that the Board denied A.S. and W.S. access to an appropriate public education by refusing to address their safety needs during the 2003-2004 school year.  In particular, Plaintiffs argue that the placements offered at the May 29, 2003, PPT meetings inadequately accommodated the children's environmental sensitivities. *See* Plaintiffs' Supplemental Memorandum of Law Re: Section 504 [doc. #74-1] at 7-8; Pls' Reply Mem. of Law [doc. #75] at 3.  As explained above, the 2004-2005 records have questionable, if any, relevance for determining whether the Board acted permissibly at or before those PPT meetings.  Nor do Plaintiffs explain what light the records might shed on any other aspect of their  discrimination  claims.   Moreover,  also  explained  above,  to  permit  the  requested

supplementation would necessitate the reopening of discovery over a year after its completion and would require the Court to receive substantial testimony to put the evidence in proper context. Given the questionable relevance of the records Plaintiffs offer, and the substantial delay and drain on resources supplementation would entail, the Court denies Plaintiffs' request to supplement the record with respect to their Section 504 claims.

### 2.    Alleged Discrimination

Plaintiffs maintain that the Board discriminated against A.S. and W.S. by "den[ying] Plaintiffs' requests for an accommodation in the form of an aseptic public school environment that would be medically safe for their respective medical needs in order to receive an appropriate education." Plaintiff's [sic] Memorandum of Law in Support of Motion for Summary Judgment [doc. #53] at 5. According to Plaintiffs, the Board's refusal to conduct pre-placement air quality testing at Madison Middle School and Frenchtown Elementary School – or, in the alternative, to fund the children's placement at Villa Maria – constituted discrimination on the basis of the children's health limitations.[4] Plaintiffs also argue that the Hearing Officer declined to consider their Section 504 claims, citing to the Hearing Officer's statement that "it is arguable whether Section 504 applies to" the children's health issues. A.S. Decision at 26; W. S. Decision at 23. As explained above, the

---

[4] Plaintiffs at times seem to suggest that their Section 504 claims include health-related concerns not addressed at the hearing before the Hearing Officer. *See, e.g.*, Pls.' Reply Mem. of Law [doc. #75] at 4 (arguing that 2004-2005 records are relevant to "whether Plaintiffs' right under Section 504 had been violated in earlier school *years*" (emphasis added)). To the extent that Plaintiffs seek to raise health-related issues not presented to the Hearing Officer, their claims would be barred by the exhaustion requirement, which applies "where plaintiffs seek relief under other federal statutes when relief is also available under the IDEA." *A.S. v. Attica Cent. Schs.*, 386 F.3d 107 (2d Cir. 2004) (noting that when a plaintiff asserts a Section 504 claim that, in substance, "seek[s] to ensure a free appropriate public education," the claim is subject to the IDEA's exhaustion requirement).

Hearing Officer did not overlook Plaintiffs' s health claims.  The Hearing Officer considered voluminous testimony, and made extensive fact-finding, regarding A.S.'s and W.S.'s safety needs.

In any event, the Court agrees with the Hearing Officer that the Board reasonably accommodated the health concerns of both A.S. and W.S.,[5] and so rejects Plaintiffs' claim that the children were discriminated against in violation of Section 504.  The Court has already explained why the Board's suggested placements of A.S. at Madison Middle School and W.S. at Frenchtown Elementary School were reasonably safe.  The Board went to great lengths to ensure that the children's learning environment would not aggravate children's sensitivities, and also demonstrated a willingness to accommodate any future health issues that might arise.  In finding the Board's actions appropriate, the Court concludes that the Board did not display the sort of "bad faith or gross misjudgment" that a Section 504 violation entails.  *See B.L. v. New Britain Bd. of Educ.*, 394 F. Supp. 2d 522, 540 (D. Conn. 2005) ("[C]ourts have found that, in order to establish a section 504 violation, a plaintiff must demonstrate bad faith or gross misjudgment in addition to the denial of a [free appropriate public education]." (internal quotation marks omitted) (second alteration in original)); *Scruggs v. Meriden Bd. of Educ.*, No. 3:03CV2224, 2005 WL 2072312, at *9 (D. Conn. Aug. 26, 2005) (same); *Zahran v. New York Dept. of Educ.*, 306 F. Supp. 2d 204 (N.D.N.Y. 2004) (same).  Therefore, the Court concludes from the record that the Board did not violate Section 504.

---

[5] The Board disputes whether A.S. has a "disability" within the meaning of Section 504.  *See* Defendant's Memorandum in Support of Motion for Judgment on the Administrative Record, and Opposition to Plaintiffs' Motion for Judgment on Counts One, Three and Four, and Plaintiffs' Motion for Summary Judgment on Counts Two and Five of the Amended Complaint [doc. #66] at 45-53. The Court does not resolve this dispute because, even assuming that A.S.'s health issues rendered her disabled within the meaning of the statute, the Court concludes that the Board appropriately accommodated her.

## C.     Connecticut's Special Education Law

Plaintiffs' third cause of action alleges that "[t]he final decision of the Due Process Hearing Officer has violated the rights of A.S. and W.S. to receive appropriate special education services under State law, Conn. Gen. Stat. § 10-76 et seq. and regulations thereunder."  First Am. Compl. [doc. #8] at 20.  Plaintiffs do not indicate how the state right to appropriate educational services differs, if at all, from the standards provided under the IDEA.   Indeed, Connecticut enacted Conn. Gen. Stat. § 10-76a et seq. "to meet its requirements [for receipt of federal funding] under" the IDEA, *Warton v. New Fairfield Bd. of Educ.*, 125 F. Supp. 2d 22, 24 n.2 (D. Conn. 2000), and several provisions of Connecticut's statute make direct reference to the IDEA, *see, e.g.*, Conn. Gen. Stat. § 10-76a(5) (defining "A child requiring special education" with reference to "the criteria for eligibility for special education pursuant to the Individuals With Disabilities Education Act"); *id.* § 10-76d (providing that a PPT shall act "in accordance with the provisions of the Individuals With Disabilities Education Act").  So far as the Court can determine, Connecticut law does not offer a substantive standard any more exacting than the IDEA's requirement of a "free appropriate public education."  Certainly, Plaintiffs do not provide any authority to support such a proposition – or even argue for it.  Nor do Plaintiffs point to any specific requirement under state law that was not met by the Board.  Therefore, because the Court has found that the Board provided A.S. and W.S. with a free appropriate public education, the Court rejects Plaintiffs' claim that the Board violated Conn. Gen. Stat. § 10-76a et seq and grants judgment on this count for the Board.[6]

---

[6] Only Counts One and Two of Plaintiffs' complaint asserted federal causes of action. Though the Court has already dispensed with these federal claims, the Court has chosen to exercise supplemental jurisdiction over the remaining state-law claims, rather than to dismiss them, because both parties have asked the Court to address these claims; because the issues involved in Counts Three and Four are subsumed under the now-decided issues involved in Counts One and Two; and

**D.      Uniform Administrative Procedures Act**

Plaintiffs' fourth cause of action charges that "[t]he final decisions of the Due Process Hearing Officer ha[ve] violated the substantial rights of A.S. and W.S. as provided for in [the Connecticut Uniform Administrative Procedure Act] insofar as [her] final decision[s] . . . were not based on substantial evidence on the record of the administrative proceeding, contrary to the evidence on the record, based upon unlawful procedures, and were arbitrary, capricious and illegal." First Am. Compl. [doc. #8] at 20.  The UAPA governs appeals to the Connecticut Superior Court of cases decided by state agencies.  *See* Conn. Gen. Stat. § 4-183.  The Court doubts whether the UAPA has any application to these proceedings.  *See B.L. v. New Britain Bd. of Educ.*, 394 F. Supp. 2d 522, 542-43 (D. Conn. 2005) (rejecting plaintiff's claim :that the final decision of the hearing officer violated [a student's] rights under . . . Connecticut's administrative procedure act" because "this Court is not subject to the standards [in the UAPA] governing appeals to the Connecticut Superior Court, but rather is subject to the procedures and standard of review set forth in [the IDEA]").

In any event, the Court has already disposed of Plaintiffs' claim that the Hearing Officer's decision was arbitrary and capricious or not based upon substantial evidence.  As to Plaintiffs' allegations of "unlawful procedures," the substance of this claim is that the Hearing Officer improperly relied on the Guidelines for Assistive Technology in reaching her conclusion that the

---

because the parties and the Court have already invested a substantial amount of time and effort considering these issues.  *See Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56 (2d Cir. 2004) ("[W]hen the dismissal of the federal claim occurs late in the action, after there has been substantial expenditure in time, effort, and money in preparing the dependent claims, knocking them down with a belated rejection of supplemental jurisdiction may not be fair. Nor is it by any means necessary." (internal quotation marks omitted)).

Board was not obligated to fund the assistive technology requested by Mr. and Mrs. W.S.  As explained above, Hearing Officer did not base her decision on the Guidelines, and in any event her decision was supported by substantial evidence.  Therefore, the Court grants judgment for the Board on Plaintiffs' claims under Connecticut's Uniform Administrative Procedures Act.

**E.      Settlement Agreement**

Finally, Plaintiffs ask this Court to enforce the terms of the parties' 2002 settlement agreement, which they claim the Board has breached.  In particular, Plaintiffs assert that the Board has violated paragraph 3 of the agreement, which provides that the Board will pay the costs, up to $5,000, of "any assistive technology" necessary for the children's education while at Villa Maria. The Board counters that Plaintiffs themselves have breached the agreement by refusing to "return any and all assistive technology and materials purchased," Affidavit of Brenda McNeal [doc. #69] Ex. 1, and that this failure excuses the Board from its obligation to reimburse Villa Maria for $5,000. At oral argument, the Board's counsel represented that the Board remained willing at that time to pay Villa Maria the $5,000 at issue, provided that the software programs and hardware devices purchased under the settlement agreement were returned to the Board. Plaintiffs respond that the term "assistive technology" in paragraph 3 includes expenses incurred for training services, and that it would be impossible to "return" such training services, the costs of which exceed $5,000.

Connecticut law requires a court, when interpreting a contract, to effectuate the parties' intentions, which are discerned from "the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction." *Tallmadge Bros., Inc. v. Iroquois Gas Transmission System*, L.P., 252 Conn. 479, 498 (2000) (internal quotation marks omitted).  The court is to give a "fair and reasonable construction of the written words and . . . the language used

must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract . . . ." *Id.* (alterations in original) (quoting *Pesino v. Atlantic Bank of New York*, 244 Conn. 85, 91-92 (1998)).  The court must enforce clear and unambiguous language and may not conjure up ambiguity where none exists.  *See United Illuminating Co. v. Wisvest-Connecticut, LLC*, 259 Conn. 665, 670 (2002).  No facts relating to the present claim are in dispute; it is a purely legal question regarding the construction of the settlement agreement, making the issue appropriate for disposition on summary judgment.[7]

Plaintiffs' claim that "assistive technology" encompasses services as well as equipment is belied by the plain terms of the agreement.  First, the ordinary meaning and usage of the word "technology" suggests items like software programs and hardware devices, not services such as training.[8]  Second, the agreement notes that the Board will pay for the assistive technology only upon a showing of "the need for and cost of such equipment and/or materials."  The agreement thus equates "assistive technology" with "equipment and/or materials" – a term that, fairly construed, does not cover training services.  Third, the agreement requires the "return [of] any and all assistive technology and materials purchased pursuant to this provision."  As Plaintiffs note, the "return" of services is impossible.  Thus, the command to "return any and all assistive technology" would

---

[7] Neither party has requested to further supplement the record with respect to this claim.

[8] As evidence that the agreement meant to include training services, Plaintiffs note that the regulations interpreting the IDEA use "assistive technology" to mean both devices and services.  *See* 34 C.F.R. § 300.6 (defining "Assistive technology service" to include "Training or technical assistance").  However, the settlement agreement's language, which the Court finds to be clear, contains no reference to the Code of Federal Regulations or any other external document. *See United Illuminating Co. v. Wisvest-Connecticut, LLC*, 259 Conn. 665, 666 (2002) ("[Where] the language employed in [an] agreement[] . . . is clear and unambiguous, . . . consideration of extrinsic evidence to ascertain the parties' intent is prohibited.").  Moreover, Plaintiffs submit no evidence to suggest that either party was aware of the regulatory definition before signing the settlement agreement.

become nonsensical if the "assistive technology" were read to include services.  Yet Plaintiffs'

proposed construction of the agreement contemplates precisely this impossible scenario.  Therefore,

the Court concludes that "assistive technology," read in context, does not encompass training

services.  *See Cantonbury Heights Condominium Ass'n, Inc. v. Local Land Development, LLC*, 273

Conn. 724, 735 (2005) ("The contract must be viewed in its entirety, with each provision read in

light of the other provisions . . . .").

Plaintiffs have thus breached paragraph 3 of the settlement agreement by failing to return the

software programs and hardware devices purchased.  A party that has materially breached a contract

may not recover under it.  *See Shah v. Cover-It, Inc.*, 86 Conn. App. 71, 77 (2004).  To determine

the materiality of a breach, Connecticut law follows the test set out in section 241 of the Restatement

(Second) of Contracts:

> In determining whether a failure to render or to offer performance is material, the
> following circumstances are significant: (a) the extent to which the injured party will
> be deprived of the benefit which he reasonably expected; (b) the extent to which the
> injured party can be adequately compensated for the part of that benefit of which he
> will be deprived; (c) the extent to which the party failing to perform or to offer to
> perform will suffer forfeiture; (d) the likelihood that the party failing to perform or
> to offer to perform will cure his failure, taking account of all the circumstances
> including any reasonable assurances; [and] (e) the extent to which the behavior of the
> party failing to perform or to offer to perform comports with standards of good faith
> and fair dealing.

*Strouth v. Pools By Murphy and Sons, Inc.*, 79 Conn. App. 55, 60 (2003) (internal quotation marks

omitted).

Applying this test to the present case, the Court concludes on the basis of the undisputed

evidence that Plaintiffs' breach was material.  The Board has already complied with its primary

obligation under the settlement agreement, set out in paragraph 1, which required the Board to

reimburse the Parents up to $50,000 for the costs of Villa Maria tuition during the 2002-2003 school

year.  Moreover, the Board has repeatedly indicated its willingness to pay for the software and equipment purchased if those items were returned to the Board.  Yet, time and again Plaintiffs have refused to do so (for no legitimate reason, in the Court's view).  Any forfeiture that Plaintiffs suffer will therefore be of their own making. However, if the Board is deprived of the return of the hardware and software, after paying for the same, the Board will be deprived of the bargain it reasonably expected when it entered into the settlement agreement. Because Plaintiffs did not fulfill their obligations under paragraph 3, neither need the Board fulfill its obligation.  *See* Restatement (Second) Contracts § 241 cmt. a (1981) (observing that section 241 "is to be applied in the light of the facts of each case in such a way as to further the purpose of securing for each party his expectation of an exchange of performances").  The Court emphasizes that this wound is entirely self-inflicted, since the Board has repeatedly stated its willingness to pay the $5,000 if the Parents would only uphold their end of the bargain.  Therefore, the Court grants the Board's motion for summary judgment with respect to this claim.

### III

In sum, the Court: (1) DENIES Plaintiffs' motion to supplement the record [doc. #45]; (2) DENIES Plaintiffs' motions for judgment [doc. #49] and for summary judgment [doc. #52]; and (3) GRANTS the Board's motion for judgment on the administrative record [doc. #65].  Judgment is for the Board is hereby granted on all claims.  **The Clerk is directed to close the file.**

IT IS SO ORDERED,


/s/_____Mark R. Kravitz_____
United States District Judge


**Dated at New Haven, Connecticut, on February 9, 2006**.